**Murray TILLMAN et al., Appellants,**

**v.**

**WHEATON–HAVEN RECREATION AS-SOCIATION, INC., et al., Appellees.**

**No. 14957.**

United States Court of Appeals, Fourth Circuit.

Oct. 27, 1971.

Rehearing and Suggestion for Rehearing En Banc Denied Dec. 16, 1971.

Allison W. Brown, Jr., Washington, D.C. (Raymond W. Russell, Rockville, Md., on the brief), for appellants.

Henry J. Noyes, Rockville, Md., and H. Thomas Howell, Baltimore, Md. (John H. Mudd, Baltimore, Md., on the brief), for appellees.

Philip J. Tierney, Asst. County Atty., for Montgomery County, Maryland (David L. Cahoon, County Atty., Alfred H. Carter, Deputy County Atty., and Stanley D. Abrams, Asst. County Atty., for Montgomery County, Md., on the brief), for Montgomery County, Maryland, amici curiae.

Before HAYNSWORTH, Chief Judge, and BOREMAN and BUTZNER, Circuit Judges.

HAYNSWORTH, Chief Judge:

The question is whether the Wheaton-Haven Recreation Association, a nonprofit group operating a member-owned swimming pool, is required to admit persons as members or guests without regard to race. We find neither the Civil Rights Act of 1866 (42 U.S.C.A. §§ 1981 & 1982) nor the Civil Rights Act of 1964 (42 U.S.C.A. § 2000a et seq.) applicable to this association and affirm the order of the District Court granting summary judgment for the defendants.

The pertinent facts are not in dispute, and, as stated by the District Court, are as follows:

Wheaton-Haven was organized in 1958 for the purpose of operating a swimming pool in an area of Silver Spring, Maryland. The pool was financed by subscriptions for membership collected·from persons residing in the area. The pool presently charges a $375 initiation fee and annual dues of $50–$60. Under the by-laws, membership is open to "bona fide residents (whether or not homeowners) of the area within a three-quarter mile radius of the pool." Members may be taken from anywhere outside the three-quarter mile

radius upon the recommendation of a member as long as members from outside the area do not exceed thirty per cent of the total membership. In either event, applicants for membership must be approved by "an affirmative vote of a majority of those present at a regular membership meeting, or a regular meeting of the Board of Directors, or a special meeting of either group called for this purpose."

Membership, which is by family units rather than by individuals, was limited to 325 families, but that limit has never been reached.[1] In practical application, membership is not limited to the geographic area. If a member who is also a homeowner sells his property and resigns his membership, his purchaser receives a first option to purchase his membership, subject to the approval of the Board of Directors.

Only members and their guests are admitted to the pool. Members of the general public cannot gain admittance by payment of an entrance fee.

Dr. and Mrs. Harry C. Press, two of the Negro plaintiffs, own a home within the three-quarter mile radius of the pool. The previous owner of the home was not a member of Wheaton-Haven. In 1968 Dr. Press sought to obtain an application for membership from members of the Board of Directors, who declined to furnish him with an application. The stipulated reason for their refusal was his race.

Mr. and Mrs. Murray Tillman are members of Wheaton-Haven. The Tillmans brought Mrs. Grace Rosner, a Negro, to the pool as their guest. She was admitted. Within a few days, Wheaton-Haven promulgated a rule limiting guests to relatives of members. Mrs. Rosner has been refused admission as a guest of the Tillmans since then. Her admission on the first occasion was at least partially responsible for the adoption of the guest limitation rule, although it was also intended to reduce the burgeoning number of guests using the pool.

The pool was constructed by a Virginia building contractor. The pool's operation involves the use of machinery manufactured outside Maryland. Snack vending machines are located in the pool area. All of the facilities are in an enclosed area accessible only to members and their guests.

Construction of the pool was done pursuant to a special exception under the zoning ordinances of Montgomery County, Maryland granted by the Montgomery County Board of Appeals. A special exception is unlike a variance; its grant is required whenever an applicant demonstrates compliance with certain conditions. Wheaton-Haven was required to demonstrate its financial responsibility by submitting evidence that 60 per cent of its projected construction costs were obligated or subscribed.

Wheaton-Haven pays state and local real property taxes but is exempt from state and federal income taxes under Md. Code Ann., Art. 81, § 288(d) (8) and 26 U.S.C.A. § 501(c) (7).

The plaintiffs contend that Wheaton-Haven's discriminatory denial of membership to Dr. Press violates 42 U.S.C.A. §§ 1981 and 1982[2] on the ground that membership is a species of personal property or a form of leasehold interest in real property, the right to purchase which may not be denied him by any person on the ground of his race. Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189. Alternatively, admission to membership is said

---

1. Membership figures are not in the record. However, counsel for the defendants stated in oral argument that membership has been held at approximately 260 families for several years.

2. "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts * * * as is enjoyed by white citizens * * *." 42 U.S.C.A. § 1981.

"All citizens of the United States shall have the same right, in every State and Territory thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C.A. § 1982.

to be a contract between the association and the member, and the right to make such a contract may not be denied him by the association because he is a Negro. Mrs. Rosner is said to have an enforceable interest in the Tillmans' membership contract as a third party beneficiary, or, if their membership be considered as a leasehold, she has an enforceable easement of ingress and egress.

The plaintiffs further argue that Wheaton-Haven is a "covered establishment" under the Civil Rights Act of 1964 (42 U.S.C.A. § 2000a) as a place of entertainment affecting commerce, and that it does not qualify for the "private club" exemption from the Act's requirement of non-discrimination because, as a matter of law, it is not private under the principles of Sullivan v. Little Hunting Park, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed. 2d 386.

I

In arguing that Wheaton-Haven's racial limitation on membership is forbidden by the 1866 Civil Rights Act, the plaintiffs perforce seek the application

of the interpretation placed upon § 1982 in Jones v. Alfred H. Mayer Co., supra. Their reliance on *Jones* is misplaced, for in that case the Supreme Court had to consider only the Act of 1866. It was not faced with the question whether a specific provision of a subsequently enacted statute may have limited its effect.[3] This appeal does present that question. If §§ 1981 and 1982 may be said to cover the admission of members or guests to a recreational facility, and to forbid racial discrimination in their selection, it is beyond question that the same conduct is covered by the Act of 1964.

■ However, the Act of 1964 contains an express proviso that in certain limited cases, involving the admissions policies of "a private club or other establishment not in fact open to the public," [4] racial discrimination is not forbidden. This exception to the ban on racial discrimination of necessity operates as an exception to the Act of 1866, in any case where that Act prohibits the same conduct which is saved as lawful by the terms of the 1964 Act.[5] Consequently,

---

3. The Open Housing Act of 1968, which was not in effect at the time of the *Jones* decision, would have expressly prohibited the discriminatory action involved in that case.

4. 42 U.S.C.A. § 2000a(e).

5. We do not suggest that a practice formerly forbidden by §§ 1981 and 1982 has, by implication, been repealed by the failure of § 2000a, later enacted, also to prohibit it. Repeal by implication is not favored in statutory construction. Jones v. Alfred H. Mayer Co., supra, n. 20 at 416, 88 S.Ct. 2186; United States v. Borden Co., 308 U.S. 188, 198–199, 60 S.Ct. 182, 84 L.Ed. 181. We have here not the mere failure in a later statute to include a prohibition contained in an earlier one covering the same subject matter; rather, to the earlier general statute, which might arguably prohibit the defendant's conduct, is added a later one which expressly protects it, if the defendant is in fact a private club.

Nor can it be argued that the exemption contained in the 1964 Act merely exempted private clubs from its remedial portions, while leaving exempted organizations subject to substantive prohibitions

contained in the 1866 Act. Although later interpretations of §§ 1981 and 1982 have rendered its assumption dubious, it is unquestionable that in 1964 Congress acted in the belief that in outlawing discrimination in public accommodations, it was writing on a clean slate. The Senate report notes that the one previous congressional enactment of a sweeping public accommodations law had been declared unconstitutional by the Supreme Court in 1883, and much of the report was devoted to a discussion in support of congressional authority to prohibit discrimination. S.Rep. No.872, 1964 U.S.Code Cong. & Admin. News, pp. 2355, 2366. The Act generated an almost unparalleled amount of debate in Congress and in the nation at large, and its exceptions were subjected to particular scrutiny. "Mrs. Murphy's roominghouse" came into the language as a generic classification during the debates. The remarks of both proponents and opponents of the Act make it clear that it was intended to outlaw racial discrimination in the furnishing of certain kinds of goods and services, except in the case of a few types of very small businesses and private organizations, to which no prohibition against discrimination was to

§§ 1981 and 1982 are unavailable to the plaintiffs as a separate and independent basis for relief. If Wheaton-Haven is a private club as defined in the 1964 Act, the exemption contained in that Act is equally applicable to the earlier statutes.

## II

■ Since the decision in Sullivan v. Little Hunting Park, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386, the analysis of an organization's claim to exemption from federal requirements of non-discrimination has acquired a double aspect. The threshold question is whether the organization is one which satisfies the traditional tests of privacy. See Daniel v. Paul, 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed.2d 318, NeSmith v. Y.M.C.A. of Raleigh, North Carolina, 4 Cir., 397 F.2d 96, United States v. Richberg, 5 Cir., 398 F.2d 523. Sullivan introduced an additional consideration, however. To qualify for the exemption an organization must not only be private internally; it must, in addition, be not so intimately related to an establishment or transaction in which non-discrimination is required that it can be said to be a part of,

or its membership an incident to, the larger, basically commercial, establishment or transaction. If such a relationship exists, the organization, no matter how internally private it may be, will be subjected to any requirement of non-discrimination that may be applicable to the other.[6] Because Sullivan involved an organization similar in many respects to Wheaton-Haven, the plaintiffs strongly urge that the case requires that, as a matter of law, Wheaton-Haven be declared not to be a private club. This argument, we think, ignores certain fundamental differences between the two organizations and fails to appreciate the significance of the Supreme Court's holding in Sullivan.

Little Hunting Park is a Virginia non-stock corporation which operates recreational facilities. Its membership was limited to persons who resided in or owned property in the Bucknell Manor, Beacon Manor, White Oaks and Bucknell Heights residential subdivisions in Fairfax County, Virginia.[7] The number of membership shares which any person might own was limited only by the number of lots he owned in the named subdivisions.[8] Paul Sullivan owned a house

extend. See remarks of Sen. Humphrey and Sen. Long, 110 Cong.Rec. 13697. Congressmen both favoring and opposing the enactment of a public accommodations law attacked the Act as written for making distinctions between permitted and prohibited discrimination. See II.Rep.No. 914, Additional Majority Views of Rep. Kastenmeier, 1964 U.S.Code Cong. & Admin.News, pp. 2391, 2409; Separate Minority Views of Reps. Poff and Cramer, Id., p. 2462. The majority, however, justified the exemption for private clubs as an appropriate recognition of rights of privacy and associational preferences in cases "where freedom of association might logically come into play * * *." Additional [Majority] Views on H.R. 7152 of Reps. McCulloch, Lindsay, Cahill, Shriver, MacGregor, Mathias and Bromwell, Id., p. 2487 at p. 2495.

6. This rule is perhaps foreshadowed by the qualification to the exemption of private clubs contained in § 2000a. A club, though private, is not exempt "to the extent that the facilities of such estab-

lishment are made available to the customers or patrons of an establishment within the scope of subsection (b) [defining covered places of public accommodations] of this section." 42 U.S.C.A. § 2000a(e). Thus, a private club which, for example, opened its doors to patrons of a particular hotel would be required to admit all such patrons without regard to race, even though it might still be able to adopt a racial admissions policy with respect to others.

7. The Board of Directors was authorized to designate other specific areas from which members might be drawn. In addition, a person might retain his membership after moving away from the designated subdivisions.

8. Although it is not expressly stated, it is inferable from Little Hunting Park's organization and membership provisions that it was built by the same real estate developers who built the four subdivisions from which members were drawn, as an aid to the sale of homes. This

in the designated area and, in consequence, owned a membership share in Little Hunting Park. Later he bought a second house in the area, into which he moved, while retaining ownership of the first. This entitled him to purchase a second membership share, which he did. After moving, Sullivan leased his old house to T. R. Freeman, Jr., a Negro. With the lease of the home he made a temporary assignment of his second membership share to Freeman, as provided in the by-laws. However, the Board of Directors refused to accept the assignment because of Freeman's race. Subsequent difficulties over the assignment resulted in Sullivan's expulsion from Little Hunting Park. On his own behalf and Freeman's, he then sued for reinstatement and to compel approval of the assignment.

The state trial court declined to scrutinize the reasons for Sullivan's expulsion because it regarded Little Hunting Park as a "private and social" club, and denied relief. The Supreme Court of Appeals of Virginia denied a writ of error. The Supreme Court reversed, holding that 42 U.S.C.A. § 1982, which it had held in Jones v. Alfred H. Mayer Co., supra, to forbid all private racial discrimination in the sale or lease of real and personal property, applied to Sullivan's transfer to Freeman of the membership share as a part of the lease of his home.[9] It further held that the Board of Directors was forbidden to frustrate the transfer on racial grounds, and that a remedy was available to the aggrieved parties.

*Sullivan* thus decided affirmatively a question expressly reserved in *Jones*— whether an incident to a transaction in which the parties are protected from racial discrimination by § 1982 is similarly protected.[10] However, it has no application to a transaction which is itself not within the protection of § 1982 and is not a part of or an incident to such a transaction. Whether *Sullivan* outlaws any or all racial discrimination in Wheaton-Haven's membership and guest policies is to be determined not by the association's formal organization but by whether it is in fact an organization in which the acquisition of membership is an incident of a protected sale or lease of property.[11]

Initially, it should be observed that the sort of transaction out of which the dispute in *Sullivan* arose, under no circumstances, could have arisen with respect to Wheaton-Haven. Unlike Little Hunting Park, Wheaton-Haven does not allow one person to own multiple memberships. Membership is by family units. An eligible family may have one membership, which entitles only family members and guests (relatives only, under its current rules) to use the pool. Thus a member of Wheaton-Haven cannot engage in the "business" of renting out his right to use Wheaton-Haven's facilities,

---

has become a common practice in the development of residential subdivisions. See Jones v. Alfred H. Mayer Co., supra, where the opinion of the Court of Appeals discloses that the defendants, developers of the Paddock Woods subdivision in which Jones sought to buy a home, had also formed the Paddock Country Club, a golf and tennis club intended for the use of the persons to whom they sold homes in the subdivision. 8 Cir., 379 F.2d 33, 35.

9. "There has never been any doubt but that Freeman paid part of his $129 monthly rental for the assignment of the membership share in Little Hunting Park. The transaction clearly fell within the 'lease.' * * * Respondents' actions in refusing to approve the assignment of the membership share in this case was clearly

an interference with Freeman's right to 'lease.' " Sullivan v. Little Hunting Park, supra, at 236–237, 90 S.Ct. at 404.

10. See Jones v. Alfred H. Mayer Co., supra, n. 10 at 413–414, 88 S.Ct. 2186. *Sullivan* did not purport to decide the question with respect to some of the other "incidents" discussed in *Jones*, and the question may become moot now that the Open Housing Act of 1968 is in full effect.

11. We need not consider any of the transactions covered by § 1981 at this juncture. Manifestly, admission to membership in Wheaton-Haven is not incident to any contract other than the membership agreement itself, if it is not incident to a contract for the sale or lease of property.

as Sullivan did with his second share. Even if a member desired to rent his one membership share, giving up the right to use the pool himself, there is no way in which it can be done under the regulations of the association, for membership is, quite simply, nonnegotiable.[12]

That a membership cannot be leased does not, of course, end the inquiry. If it is transferred as an incident to a sale of property, the membership would be subject to the same requirement of nondiscrimination that § 1982 imposes on the major transaction. On this point the plaintiffs place their principal reliance. Under the by-laws, if a member of Wheaton-Haven who is a property-owner sells his home and resigns his membership,[13] his purchaser is entitled to a first option to become a member. The plaintiffs urge that this is merely a devious method of accomplishing the same result as was accomplished by direct transfer in *Sullivan*. Under other circumstances we might agree, but in this case we cannot. In the context of this case, the overall operations of Wheaton-Haven, and the positions of the parties, the option provision is so speculative and remote that it cannot be a realistic basis for a determination that there is a transfer of membership in Wheaton-Haven incident to a transaction in real or personal property.

A first option is not the equivalent of acceptance for membership, although in other circumstances it could be. The holder of a first option receives the right to have his application for membership considered without taking his place at the end of the waiting list. No other rights attach to the option. Because the effect of the option is solely to vault a resigning member's vendee over the heads of persons on the waiting list to receive immediate consideration for a newly vacated membership, it can operate only when the membership rolls are full, and a waiting list exists. Absent a full membership list, the new homeowner receives literally nothing, for his "option" entitles him only to what every other prospective member is entitled to— the right to be considered immediately for membership in an organization which has room for all present applicants. The value of a first option to acquire something which is immediately available in sufficient quantity to supply all who want it is nothing.

Wheaton-Haven's membership rolls are not full and have never been. There are some sixty vacancies out of the authorized membership of 325, a situation which has obtained for several years. Thus, any eligible person, with or without an option, can have an application for membership considered without the necessity of working his way up through a waiting list. The first option, from the founding of Wheaton-Haven through the foreseeable future, is a thing utterly without use or value and, as such, is a functional nullity. It is far too tenuous a thread to support a conclusion that there is a transfer of membership incident to the purchase of property.[14]

12. There is a provision in the by-laws which allows members who cannot use the pool to become inactive, in which event a number of "temporary memberships" not greater than the number of inactive memberships is authorized. However, temporary memberships are authorized to be offered to waiting applicants for full membership, and only in the order in which they appear on the waiting list. Thus, it is impossible for a member to become inactive in order to give another selected person temporary access to the pool. He has no control over the selection of the persons who will be offered a temporary membership, for it automatically goes to the first person on the waiting list. Additionally, the temporary membership provision is effective only when the rolls are full, and this condition has never existed at Wheaton-Haven.

13. A member is not required to resign in the event he sells his home. If he retains his membership, of course, no option is given to his purchaser.

14. It is difficult to understand how the argument on this point would benefit the plaintiffs in any event. The person from whom Dr. Press purchased his home was not a member of Wheaton-Haven, and Dr. Press acquired nothing connected with Wheaton-Haven by his purchase. Were the situation presented where a Negro

Significantly, the plaintiffs have never suggested that any person ever became a member of Wheaton-Haven in this manner, in sharp and marked contrast to the situation in *Sullivan*, where transfers and assignments incident to land sales were expressly provided for and appear to have occurred as a routine matter.

Finally,[15] plaintiffs argue that *Sullivan* controls this case because Wheaton-Haven draws members from an area so geographically delimited that the purchase of a home in the area impliedly carries with it the right to membership in the pool. This argument is of much broader scope than the argument based on the first option provision. If correct, it means much more than that some individual memberships in Wheaton-Haven may be incident to sales of property, and, as such, subject to the purchaser's right to enjoy membership as incidental to them without interference by the other members. It would mean that the whole of Wheaton-Haven is an incident to home ownership in the area, as was the situation with the Paddock Country Club in Jones v. Alfred H. Mayer Co., supra. From this it would follow that any person purchasing a home in the designated area would have a right to be considered for membership without regard to race.

The argument, however, mischaracterizes both Wheaton-Haven and Little

Hunting Park in an attempt to make them appear functionally identical. The sources of members for the two organizations are markedly different. Although *Sullivan* did not expressly hold that Little Hunting Park would be required to admit any eligible person to membership without racial discrimination, it is reasonably inferable from the opinion, and we will assume here that a general requirement of non-discrimination in member selection is imposed by *Sullivan* on any organization which stands in the same relationship to the area from which it draws members as does Little Hunting Park to the area it serves.

Little Hunting Park drew members only from four named residential subdivisions. Some confusion is created by the fact, pointed out by the plaintiffs, that some of its members resided elsewhere. However, it should be noted that one need not reside in the named subdivisions in order to purchase a membership share in Little Hunting Park. One need only own property there.[16] In addition, it was possible for a person who had acquired membership through residence or ownership in one of the subdivisions to retain it after he moved away. These factors easily explain why Little Hunting Park had non-resident members. Membership was unequivocally tied to the land, whether one resided there or owned it.[17]

had purchased a home from a resigning member and been refused consideration for membership, we might have a different case. Here there is no transaction on the basis of which Dr. Press could have acquired a specific right which, were he white, would have carried with it some embryonic interest in Wheaton-Haven.

15. The plaintiffs make one additional argument which is not strenuously urged. It is suggested that *Sullivan* holds that any organization which either makes use of land, so that a member might be said to lease the property on which it carries out its functions, or which enters into contracts with its members, is not private. This argument turns *Sullivan* on its head. It is the fact of membership being incidental to the purchase or lease of property (or perhaps to the making of some other contract) which, *Sullivan* holds, brings a club, perhaps otherwise private,

within the ambit of § 1982 so as to protect the purchaser or lessee in his right to enjoy the membership incident to the property interest which he purchased or leased. That a club must use land in order to carry out its functions, or that it makes a "contract" of membership with everyone who joins, is irrelevant to the problem with which *Sullivan* dealt.

16. It is precisely this feature of Little Hunting Park that renders it most suspect as an incident to sales in a commercially developed subdivision rather than a truly voluntary association. It encouraged the development of absentee landlords dealing commercially in membership shares, a situation which is impossible at Wheaton-Haven.

17. The Board of Directors of Little Hunting Park was authorized to designate additional areas as sources of members,

Wheaton-Haven accepts as members persons who actually reside within an area described by a circle three quarters of a mile in radius with its center at the pool. On the recommendation of a member, and subject to a limit of thirty percent of the total membership, it will accept persons as members who live anywhere outside the three quarter mile circle.

Fundamental differences are at once apparent. Little Hunting Park appears to be characteristic of the sort of recreational facilities frequently installed in modern real estate developments, which are included by the developers to enhance their sales of individual properties, and which are "private" in the sense that they serve only those persons who purchase from the developers. The right to use the recreational facilities is incidental to, or part of, the rights acquired directly with the acquisition of possessory rights in a lot in one of the designated subdivisions.

The contrary is suggested by Wheaton-Haven's organization and structure, and confirmed by its history. Its benefits are not limited to those who deal commercially with a particular developer or group of them, and its members are not limited to, nor does it purport to serve all of, the "general public" in any recognizable community. There is an area preference, and nothing more, in the provision that not more than thirty per cent of the memberships may be awarded to persons who reside more than three quarters of a mile from the pool.

■ The difference between a real estate developer who builds recreational

facilities, the use of which he restricts to those persons who purchase his homesites, and a voluntarily associated group of neighborhood residents who, desiring a facility for their use, band together to build one, and who, desiring that most of their group should be reasonably near neighbors, set up a proportional preference for persons living near the facility, is one which goes to the very heart of the difference between public and private. The history of Wheaton-Haven's formation and development, noted briefly above, demonstrates that it is just such a voluntary and spontaneous organization. The District Court correctly found *Sullivan* inapplicable to such an organization.

### III

There remains the question whether Wheaton-Haven is a "private club or other establishment not in fact open to the public." Although the preceding discussion may suggest the answer, the point requires separate consideration, as there are additional factors which must be taken into account in order to make a full determination of the claim for exemption under the specific terms of the 1964 Act.

The cases under 42 U.S.C.A. § 2000a (e) are now so numerous, and the standards applicable in determining a claim for exemption so often discussed, that it would serve no purpose to list those standards.[18] Considered in their light, Wheaton-Haven qualifies under the Act as a private club.

Certain of its features are obvious indicators of its private nature. Its

---

but counsel for plaintiffs, who represented the successful plaintiffs in *Sullivan* and has supplemented the record with a great deal of background information about that case and about Little Hunting Park in particular, has not suggested that any additional areas were so designated. It does not require a great leap to suppose that if an additional area should be named by the directors, it would undoubtedly be another subdivision opened by the same developers who had opened the original four.

18. See, e. g., Daniel v. Paul, 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed.2d 318; NeSmith v. Y.M.C.A. of Raleigh, North Carolina, 4 Cir., 397 F.2d 96; U. S. v. Richberg, 5 Cir., 398 F.2d 523; Stout v. Y.M.C.A. of Bessemer, Alabama, 5 Cir., 404 F.2d 687; Wesley v. City of Savannah, S.D.Ga., 294 F.Supp. 698; U. S. by Katzenbach v. Jack Sabin's Private Club, E.D.La., 265 F.Supp. 90; Williams v. Rescue Fire Co., D.Md., 254 F. Supp. 556.

structure is that of a private association, though that is not of great weight, since it is relatively easy for a place of public accommodation to take on the formal features of a club without changing its nature. Unlike every organization which has ever been held to be a "sham" private club, Wheaton-Haven is owned, operated and controlled entirely by its membership. It was initially financed through the initiation fees of the first members, and new members must make a comparatively heavy investment of $375 in order to join. The members of the Board of Directors are required to be club members. Regular membership meetings are held, and member participation is strikingly high.[19] Substantial annual dues are charged, and members are liable for further assessments if the dues are insufficient to meet annual expenses. Only members and their guests can use the pool. There is no way in which a non-member, by payment of an admission fee, can gain entrance. Nor does Wheaton-Haven publicly solicit members.[20]

Wheaton-Haven does not hold itself out in any way as serving the general public, whether that aggregate be considered from the standpoint of Maryland, Montgomery County, Silver Spring or the three quarter mile circle from which seventy per cent of the members are drawn. The membership limitation is such that even if the "general public" is regarded as including only the residents of the last, most severely delimited area, Wheaton-Haven has deliberately avoided any attempt or claim to serve the group as a whole.[21]

For purposes of federal and state taxation Wheaton-Haven is classified as other private clubs.[22] That it goes by a different name—community swimming pool—for zoning purposes is not relevant to our inquiry. The name is without significance. It serves merely to subject the organization to certain requirements relating to set-backs, provision of parking spaces, and financial responsibility because of the obvious capacity of such a facility to became a public nuisance if it is not regulated somewhat more closely than are organizations operating other kinds of facilities. That the state requires it to meet certain neutral conditions relating to health, safety or convenience in order to operate neither makes it a public facility nor involves the state in its membership policies.

The final test, and one of the more important ones, is the test of exclusivity. The test is an elusive one, because in many cases the membership requirements of a genuine private organization, though real, are not susceptible to precise definition. In essence, a private club is a

---

19. The exhibits filed by Montgomery County, which was allowed to participate as *amicus curiae* urging reversal, reveal that at one recent membership meeting there were 106 members present and voting. No figures were supplied for other meetings. The one in question was held at the time the guest limitation was adopted, and may or may not be typical.

20. The pool engages in no advertising whatever. At the pool area there is a sign giving the telephone number of the membership chairman, but it is not disputed that this sign is so positioned that it can be seen only by the members and their guests who have already been admitted to the area.

21. Cf. NeSmith v. Y.M.C.A. of Raleigh, North Carolina, supra, in which the defendant offered membership to any person in the city of Raleigh, and in fact did have several thousand members.

Population figures are not included in the record. However, it is manifest that in a nearby suburb of Washington, D. C., a residential area including almost two square miles will have a number of residents exceeding by many times the number which Wheaton-Haven was designed to serve.

22. The County contends that, as a community swimming pool, Wheaton-Haven is favored over private clubs by the state income tax laws. This contention finds no support in Maryland law. Wheaton-Haven's exemption from state income taxes is derived from Md.Code, Art. 81, § 288(d) (8), specifically exempting community swimming pools. In the same section, § 288(d) (5), religious, educational, charitable, social, fraternal and other similar corporations, a category which, so far as we can determine, includes almost every kind of private club, are granted the identical tax exemption.

voluntary and generally self-governing association of persons drawn together for the furtherance of a common goal. The common interest in a single activity or project is itself often the principal basis of selectivity, and many clubs require no other. Often the members of a club desire a broader range of commonality of interests than a single common interest, to the end that the members should be socially congenial. Where an organization exhibits no discernible basis of commonality other than a common desire to exclude persons of other races, it becomes difficult, if not impossible, to distinguish it from a place of public accommodation attempting to masquerade as a club. As is the case in any line-drawing exercise, the difficulty here lies in determining the nature of an organization which appears to be somewhere between the obviously public and the obviously private. Generally, the courts have looked for assistance in such cases to the other distinguishing characteristics, discussed above, which mark an organization as public or private. In those respects Wheaton-Haven appears unmistakably private. Nevertheless, it lacks easily ascertainable standards for membership other than, obviously, an interest in swimming sufficiently great to impel a person to pay the very substantial fees and dues that membership entails.

That standards are not immediately and precisely ascertainable, however, does not mean that they do not exist. Some considerations of social and financial standing are implicit in the size of the fees and dues. There are selective elements other than race alone. Rejection of white applicants is, though rare, not unheard of. The record does not contain the reason for the rejection, but the application of one white man was rejected.[23] The parties did not address themselves to the point, but the County points out that interviews are conducted with prospective members, although it suggests that these interviews are not far-ranging.

■ In sum, although Wheaton-Haven's membership admittedly, is racially identifiable, it has been influenced by other criteria. Given the fact that its form of organization, its manner of operation, and its member activities are all characteristic of a bona fide private club rather than a place of public accommodation, and that it clearly meets the only express test set out by Congress—that it be "not in fact open to the public"—we cannot say that its inability to produce a detailed set of clear, precise and unmistakable standards for membership marks it as a covered establishment. From the standpoint of all the relevant factors taken as a whole, it has demonstrated that it is private, within the meaning of the federal statute.

A brief comment is in order concerning the participation in the case of Montgomery County. The County has enacted an anti-discrimination ordinance, which it has sought to have applied to Wheaton-Haven.[24] It sought leave to

23. This low rejection rate is in connection with formal applications only. At oral argument we were told by counsel for the defendants that there have been numerous occasions in the past when a white prospective member would be rejected after an informal interview and not given an application for membership. This would not show on the club's records as a rejection, but it would have the same effect. This information is not in the record, but the plaintiffs have not suggested that it is an inaccurate representation. It is typical of the manner in which private clubs often screen prospective members. Very often the actual application for membership is strictly a formality, for the club's decision will have been already made.

Dr. Press, of course, was rejected in exactly this manner. Because he was never allowed to make a formal application for membership, he would not appear on Wheaton-Haven's books as having been rejected, despite the fact that we know he was.

24. Because the ordinance was enacted in executive rather than legislative session, a question has been raised as to its validity under the Maryland Constitution. That question, of course, will be finally resolved in the courts of Maryland and does not concern us.

participate in the case in the belief that a decision favorable to Wheaton-Haven would preclude any effort on its part to have the local ordinance applied to it and similar organizations. The assumption, of course, is quite erroneous. Our decision here has no effect on state or local laws or their interpretation by state courts. The federal statute is unlike the county ordinance, and it is for the courts of Maryland alone to determine what objects the local law includes. Nor is there any pre-emptive effect on local attempts to eradicate racial discrimination at other levels than those reached by federal law.[25] The contrary is well established by the terms of the Civil Rights Act, 42 U.S.C.A. § 2000a–6(b), and by previous decisions of the Supreme Court. Colorado Anti-Discrimination Commission v. Continental Air Lines, 372 U.S. 714, 83 S.Ct. 1022, 10 L.Ed.2d 84.

Affirmed.

BUTZNER, Circuit Judge (dissenting):

I would have granted the plaintiffs' motion for summary reversal because the judgment dismissing their claim is a marked departure from authoritative precedent construing those provisions of the Civil Rights Act of 1866 codified as 42 U.S.C. § 1982 (1970).

The bylaws of the Wheaton-Haven Recreation Association, Inc. provide that membership "shall be open" to residents who live within three-quarters of a mile of the pool, subject to a stated maximum number of families and to approval of the association acting through its members or its board of directors. The bylaws also provide for Wheaton-Haven to repurchase the membership of a member who resigns and sells his home. In that event, the purchaser of the home shall have the first option to buy the membership of the seller from Wheaton-Haven, subject to the approval of the board.

Dr. and Mrs. Harry C. Press own a home in this neighborhood. It is undisputed that they were disqualified from membership for one reason—they are black. Had they been white persons, they could have purchased a membership in Wheaton-Haven. Membership would have afforded them not only a right to use the pool but, of greater significance to this case, it would have allowed them to sell to the eventual purchaser of their home an option to purchase their membership.

## I

The Civil Rights Act of 1866 provides in part:

"All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982.

In Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), the Court applied the Act to bar racial discrimination in the sale of a house. The Court cautioned that "Negro citizens * * * would be left with 'a mere paper guarantee' if Congress were powerless to assure that a dollar in the hands of a Negro will purchase the same thing as a dollar in the hands of a white man. At the very least, the freedom that Congress is empowered to secure under the Thirteenth Amendment includes the freedom to buy whatever a white man can buy, the right to live wherever a white man can live. If Congress cannot say that being a free man means at least this much, then the Thirteenth Amendment made a promise the Nation cannot keep." 392 U.S. at 443, 88 S.Ct. at 2205.

*Jones v. Alfred H. Mayer Co.* establishes beyond doubt that Dr. and Mrs. Press have the same right enjoyed by their white neighbors to purchase, hold,

---

**25.** We recognize that, as Mr. Justice Harlan has pointed out, there may be constitutional questions concerning the attempted eradication of some very low levels of private discrimination. Sullivan v. Little Hunting Park, supra, dissenting opinion of Harlan, J., at 248, 90 S.Ct. 400.

sell, and convey real and personal property. They are entitled to no less. The sole question raised by this case, then, is whether membership in Wheaton-Haven is property within the meaning of § 1982. I believe it is.

While the details differ, this case is indistinguishable in all material aspects from Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed. 2d 386 (1969). Under the bylaws of Little Hunting Park, membership in a swimming pool association was open to residents in an area of Fairfax County, Virginia, and a member could assign his membership to a tenant, subject to the approval of the board of directors. When a white member attempted to assign a membership to his tenant, the board of directors refused approval because the tenant was black. The trial court denied relief to the landlord and tenant on the ground that Little Hunting Park was a private social club. Finding "nothing of the kind," the Supreme Court reversed, saying: "There was no plan or purpose of exclusiveness. It is open to every white person within the geographic area, there being no selective element other than race. * * * It is not material whether the membership share be considered realty or personal property, as § 1982 covers both." 396 U.S. at 236, 90 S.Ct. at 404. And the Court held that the transaction clearly fell within the right to "lease" protected by § 1982. 396 U.S. at 237, 90 S.Ct. 400.

The points of distinction involving the nature of the property right considered in *Sullivan* and the nature of a Wheaton-Haven membership are not of controlling significance.

It is immaterial that a tenant claimed membership in Little Hunting Park under a lease, while Dr. and Mrs. Press base their claim on ownership of real property situated less than three-quarters of a mile from the pool. Section 1982 protects the rights to "purchase" and "hold" property no less than the right to "lease."

Nor does it matter that families who own no real estate can join Wheaton-Haven or that Dr. and Mrs. Press are seeking to acquire membership on the basis of owning a home instead of exercising an option. Under the bylaws membership is "open" to a white neighbor without the exercise of an option. Having obtained a membership, the neighbor can eventually sell an option for it along with his home in accordance with Wheaton-Haven's bylaws. Since membership in Wheaton-Haven is incident to the ownership of property, it is covered by § 1982.

Similarly, I cannot accept Wheaton-Haven's argument that because the membership rolls are not presently filled the option has little or no value. Several years from now it may well be that a white neighbor can sell his home at a considerably higher price than Dr. and Mrs. Press because the white owner will be able to assure his purchaser of an option for membership in Wheaton-Haven. Dr. and Mrs. Press, however, are denied this advantage. Even though the present value of an option cannot be readily ascertained, a dollar in the hands of Dr. and Mrs. Press, in the language of Jones v. Alfred H. Mayer Co., should be able to purchase at least the same thing as a dollar in the hands of their white neighbors. Section 1982 should not be construed to deny a bargain on the basis of race.

The vice of Wheaton-Haven's discriminatory practices is similar to Little Hunting Park's. In each case ownership of real property by a white person carried with it the right to a transferable membership—a right denied to black persons. Little Hunting Park's transfer by assignment and Wheaton-Haven's use of an option differ only in form, not substance. The congressional commitment to equal rights under the law manifested by the enactment of the Civil Rights Act of 1866 cannot be served by viewing this case as a simple exercise in the fine art of conveyancing. The case involves far more. It is an attempt to secure what the proponents of the Act envisioned and the Supreme Court has preserved—the "great fundamental rights" of "all men,

whatever their race or color" to "acquire" and "dispose" of property. Jones v. Alfred H. Mayer Co., 392 U.S. 409, 432, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).

## II

I doubt the pertinency of the claim that the Civil Rights Act of 1866 is circumscribed or limited by the Civil Rights Act of 1964.[1] This is an inappropriate case to consider whether private clubs are excluded from the Civil Rights Act of 1866. The plaintiffs make no claim for admission to a private club. Instead they contend correctly, I believe, that Wheaton-Haven is not a private club.

To maintain its claim of privacy, Wheaton-Haven points to its rejection of one white applicant since 1958, and its counsel in oral argument asserted that other persons had been informally rejected. But the record and counsel's excursion outside it do not establish that any homeowner living within three-quarters of a mile of the pool was denied membership or that any person acquiring an option with his purchase of a house was turned away.[2]

It is difficult to believe that a club is private when its membership is so closely tied to real estate bought and sold on the open market. Sullivan v. Little Hunting Park holds that in a similar context the test of a private club is whether there is "a plan or purpose of exclusiveness." 396 U.S. at 236, 90 S.Ct. at 404. Here there is none save race. As far as this record shows, Wheaton-Haven's bylaws mean just what they say: membership is "open" to residents within a specified geographic area and membership can be transferred to the purchaser of a member's house. It is immaterial that membership initially and by transfer is subject to the approval of

the corporation either through its members or its board of directors. The bylaws of Little Hunting Park also subjected assignment of membership to approval of the board of directors. But as *Sullivan* teaches, § 1982 prohibits the board from withholding approval because of race. 396 U.S. at 236.

Wheaton-Haven emphasizes that Little Hunting Park had aspects of commercialism that it lacks. The record before us does not support this conclusion, but even if it did, it would be irrelevant. *Sullivan* did not turn on this point. The test is not whether the organizers were commercially motivated, but whether there is presently a "plan or purpose of exclusiveness" with respect to membership. 396 U.S. at 236, 90 S.Ct. 400.

## III

Mr. and Mrs. Murray Tillman are white members of the association who brought a black guest, Mrs. Grace Rosner, to the pool. Her visit provoked a change in the bylaws; guests were limited to relatives of members—all of whom are white. Unquestionably Wheaton-Haven can limit the number of guests a member can bring. Similarly, it can refuse to admit guests, regardless of race, who because of their demeanor or age would unduly burden the use of the pool. But otherwise valid limitations cannot be couched directly or indirectly to restrict the race of guests. The Tillman membership is a valuable property right, an incident of which is the right to invite guests. The right would be empty indeed unless the guests have the right to accept. Racial restrictions on the right to invite guests, and to accept invitations, are racial restrictions on the right to hold property that violate § 1982. A white host can vindicate this right. Walker v. Pointer, 304 F.Supp. 56 (N.D.

---

1. Similar arguments have been made and rejected. *E. g.*, Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 237, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969) ; *cf.* Jones v. Alfred H. Mayer Co., 392 U.S. 409, 413–17, 88 S.Ct. 2186, 20 L.Ed. 2d 1189 (1968) ; Sanders v. Dobbs Houses, Inc., 431 F.2d 1097, 1100 (5th Cir. 1970).

2. Of course, Wheaton-Haven could refuse membership to any number of persons, black or white, who lived within or without the geographic area designated in its bylaws, without infringing rights secured by § 1982 if refusal were not based on race.

Tex.1969). *Cf.* Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 237, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969).

I would reverse the judgment, enter summary judgment for the plaintiffs, and remand for further proceedings consistent with this opinion.

## ON PETITION FOR REHEARING

### PER CURIAM:

In the petition for rehearing the Court's attention was invited to the answer to an interrogatory indicating that the membership list of Wheaton-Haven Recreation Association was full in the spring of 1968 when Dr. Press first became interested in considering a possible application for membership. That answer seems to be contradicted by an answer to another interrogatory reporting the admission of three new members before any intervening resignation, but finds general support in a deposition of a member of Wheaton-Haven's board who championed the cause of the admission of Dr. Press.

The briefs, the appendices, and the findings of the district court all seemed to warrant the statement in the opinion that the membership list had never been full. That inadvertent misstatement is now corrected to reflect a full membership list in the spring of 1968. The result is unaffected, however, for it is clear that the membership did drop off thereafter, that Dr. Press would have been admitted without delay except for the fact that his submission of a formal application was foreclosed by the resolution adopted by the members in the fall of 1968, and that there has been no waiting list since then. The situation with respect to the presence or absence of vacancies in the membership list has relevance only prospectively from the date of that meeting of the membership.

The petition for rehearing and the suggestion for rehearing en banc having been considered, the court having been polled and less than a majority of the panel having voted for a rehearing and less than a majority of the court having voted for a rehearing en banc, the petition for rehearing and the suggestion for rehearing en banc are both denied.

WINTER and CRAVEN, Circuit Judges, dissenting:

We dissent from the denial of rehearing en banc.

For the reasons expressed by Judge Butzner, the dissenting member of the panel which decided the case, we think the instant case is indistinguishable from Sullivan v. Little Hunting Park, Inc., 396 U.S. 299, 90 S.Ct. 400, 24 L.Ed. 2d 386 (1969), and plaintiffs are entitled to judgment on its authority.

Even if our reading of *Little Hunting Park* is erroneous, we deplore the majority's arriving at the dubious holding that the Civil Rights Act of 1866 was impliedly repealed in part by the Civil Rights Act of 1964 when that question has been neither briefed nor argued. A holding of that importance and scope— and one apparently in conflict with decisions of other courts that have considered the question—should be reached if not by the court sitting en banc, then at least by the panel hearing the case, only after full adversary treatment by the parties.