# TILLMAN ET AL. *v.* WHEATON-HAVEN RECREATION ASSN., INC., ET AL.

No. 71-1136.  Argued November 15, 1972—
Decided February 27, 1973

BLACKMUN, J., delivered the opinion for a unanimous Court.

*Allison W. Brown, Jr.,* argued the cause for petitioners. With him on the briefs were *Raymond W. Russell, Samuel A. Chaitovitz, Melvin L. Wulf,* and *Sanford Jay Rosen.*

*Henry J. Noyes* argued the cause and filed a brief for respondents Wheaton-Haven Recreation Assn., Inc., et al. *John H. Mudd* argued the cause for respondent *E. Richard McIntyre.* With him on the brief was *H. Thomas Howell.**

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

Wheaton-Haven Recreation Association, Inc., a non-profit Maryland corporation, was organized in 1958 for the purpose of operating a swimming pool. After a membership drive to raise funds, the Association obtained zoning as a "community pool" and constructed its facility near Silver Spring, Maryland. The Association is essentially a single-function recreational club, furnishing only swimming and related amenities.[1]

---

*Briefs of *amici curiae* urging reversal were filed by *Solicitor General Griswold, Assistant Attorney General Norman, Deputy Solicitor General Wallace, William Bradford Reynolds,* and *John C. Hoyle* for the United States; by *Alfred H. Carter* for Montgomery County, Maryland; and by *Philip J. Tierney* and *George D. Solter* for the Maryland Commission on Human Relations.

[1] Candy, ice cream, and soft drinks have been sold on the premises, but these were merely incidentals for the convenience of swimmers during the season. Aside from meetings of the board of directors and of the general membership, the premises apparently have been utilized only for pool-related activities.

Membership is by family units, rather than individuals, and is limited to 325 families.[2] This limit has been reached on at least one occasion. Membership is largely keyed to the geographical area within a three-quarter-mile radius of the pool.[3] A resident (whether or not a homeowner) of that area requires no recommendation before he may apply for membership; the resident receives a preferential place on the waiting list if he applies when the membership is full; and the resident-member who is a homeowner and who sells his home and turns in his membership, confers on the purchaser of his property a first option on the vacancy created by his removal and resignation. A person residing outside the three-quarter-mile area may apply for membership only upon the recommendation of a member; he receives no preferential place on the waiting list if the membership is full; and if he becomes a member, he has no way of conferring an option upon the purchaser of his property. Beyond-the-area members may not exceed 30% of the total. Majority approval of those present at a meeting of the board of directors or of the general membership is required before an applicant is admitted as a member.

Only members and their guests are admitted to the pool. No one else may gain admission merely by payment of an entrance fee.

In the spring of 1968 petitioner, Harry C. Press, a Negro who had purchased from a nonmember a home within the geographical preference area, inquired about

---

[2] Wheaton-Haven presently charges an initiation fee of $375 and annual dues ranging from $50 to $60, depending on the number of persons in the family unit.

[3] The Association's bylaws provide that "[m]embership shall be open to bona fide residents (whether or not home owners) of the area within a three-quarter mile radius of the pool," and "may be extended" to others "who shall have been recommended . . . by a member."

membership in Wheaton-Haven. At that time the Association had no Negro member. In November 1968 the general membership rejected a resolution that would have opened the way for Negro members. Dr. Press was never given an application form, and respondents concede that he was discouraged from applying because of his race.

In July 1968 petitioners Murray and Rosalind N. Tillman, who were husband and wife and members in good standing, brought petitioner Grace Rosner, a Negro, to the pool as their guest. Although Mrs. Rosner was admitted on that occasion, the guest policy was changed by the board of directors, at a special meeting the following day, to limit guests to relatives of members. Respondents concede that one reason for the adoption of this policy was to prevent members from having Negroes as guests at the pool. Under this new policy Mrs. Rosner thereafter was refused admission when the Tillmans sought to have her as their guest. In the fall of 1968 the membership, by resolution, reaffirmed the policy.

In October 1969 petitioners (Mr. and Mrs. Tillman, Dr. and Mrs. Press, and Mrs. Rosner) instituted this civil action against the Association and individuals who were its officers or directors, seeking damages and declaratory and injunctive relief, particularly under the Civil Rights Act of 1866, now 42 U. S. C. § 1982,[4] the Civil Rights Act of 1870, now 42 U. S. C. § 1981, and Title II of the Civil Rights Act of 1964, 78 Stat. 243, 42 U. S. C. § 2000a, *et seq.* The District Court, in an unreported opinion, held that Wheaton-Haven was a private club and exempt from the nondiscrimination provisions of the statutes. It granted summary judgment for defendants. The

[4] "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U. S. C. § 1982.

Court of Appeals affirmed, one judge dissenting. 451 F. 2d 1211 (CA4 1971). It later denied rehearing *en banc* over two dissents, *id.,* at 1225. We granted certiorari, 406 U. S. 916 (1972), to review the case in the light of *Sullivan* v. *Little Hunting Park,* 396 U. S. 229 (1969).

I

In *Jones* v. *Alfred H. Mayer Co.,* 392 U. S. 409 (1968), this Court, after a detailed review of the legislative history of 42 U. S. C. § 1982, *id.,* at 422–437, held that the statute reaches beyond state action and is not confined to officially sanctioned segregation. The Court subsequently applied § 1982 in *Sullivan* to private racial discrimination practiced by a nonstock corporation organized to operate a community park and playground facilities, including a swimming pool, for residents of a designated area. The Presses contend that their § 1982 claim is controlled by *Sullivan.* We agree.

A. The Court of Appeals held that § 1982 would not apply to the Presses because membership rights in Wheaton-Haven could neither be leased nor transferred incident to the acquisition of property. 451 F. 2d, at 1216–1217. In *Sullivan,* the Court concluded that the right to enjoy a membership share in the corporation, assigned by a property owner as part of a leasehold he was granting, constituted a right "to . . . lease . . . property" protected by § 1982. 396 U. S., at 236–237. The Court of Appeals distinguished property-linked membership shares in *Sullivan* from property-linked membership preferences in Wheaton-Haven by emphasizing the speculative nature of the benefits available to residents of the area around Wheaton-Haven. We conclude that the Court of Appeals erroneously characterized the property-linked preferences conferred by Wheaton-Haven's bylaws.

Under the bylaws, a resident of the area within three-quarters of a mile from the pool receives the three preferences noted above: he is allowed to apply for membership without seeking a recommendation from a current member; he receives preference over others, except those with first options, when applying for a membership vacancy; and, if he is an owner-member, he is able to pass to his successor-in-title a first option to acquire the membership Wheaton-Haven purchases from him.[5] If the membership is full, the preference-area resident is placed on the waiting list; other applicants, however, are required to reapply after those on the waiting list obtain memberships.

The Court of Appeals concluded, incorrectly it later appeared, that the membership had never been full,[6] and that the option possibility, therefore, was "far too tenuous a thread to support a conclusion that there is a transfer of membership incident to the purchase of property." 451 F. 2d, at 1217. Since the Presses had not purchased their area home from a member, the court found no transaction by which the Presses could have acquired a membership preference. 451 F. 2d, at 1217–1218, n. 14.

[5] Under the Wheaton-Haven system, a within-the-area member selling his home may either retain his membership or seek to sell it back to the Association. If Wheaton-Haven is willing to purchase, it pays 80% of the initial cost if the membership is not full, and 90% if the membership is full. The purchaser of the member's home then has a first option on the membership so released by the seller. The practical effect of this system is to prefer applicants who purchase from members over other applicants, particularly at a time when the membership is full.

[6] In the court's *per curiam* statement responsive to the petition for rehearing, it described its earlier observation that the membership list had never been full as an "inadvertent misstatement . . . now corrected to reflect a full membership list in the spring of 1968." 451 F. 2d 1211, 1225.

We differ from the Court of Appeals in our evaluation of the three rights obtained. The record indicates that the membership was full in the spring of 1968 but dropped, perhaps not unexpectedly in view of the season, in the fall of that year. We cannot be certain, either, that the membership would not have remained full in the absence of racial discrimination,[7] or that the membership will never be full in the future. As was observed in dissent in the Court of Appeals:

"Several years from now it may well be that a white neighbor can sell his home at a considerably higher price than Dr. and Mrs. Press because the white owner will be able to assure his purchaser of an option for membership in Wheaton-Haven. Dr. and Mrs. Press, however, are denied this advantage." 451 F. 2d, at 1223.

Similarly, the automatic waiting-list preference given to residents of the favored area may have affected the price paid by the Presses when they bought their home. Thus, the purchase price to them, like the rental paid by Freeman in *Sullivan,* may well reflect benefits dependent on residency in the preference area. For them, however, the right to acquire a home in the area is abridged and diluted.

When an organization links membership benefits to residency in a narrow geographical area, that decision infuses those benefits into the bundle of rights for which an individual pays when buying or leasing within the area. The mandate of 42 U. S. C. § 1982 then operates to guarantee a nonwhite resident, who purchases, leases, or holds this property, the same rights as are enjoyed by a white resident.

---

[7] The record reveals that a number of members withdrew when the present suit was filed. Tr. of Oral Arg. in District Court 15.

B. Respondents contend that even if 42 U. S. C. § 1982 applies, Wheaton-Haven nevertheless is exempt as a private club under § 201 (e) of the Civil Rights Act of 1964, 42 U. S. C. § 2000a (e),[8] with a consequent implied narrowing effect upon the range and application of the older § 1982. In *Sullivan* we found it unnecessary to consider limits on § 1982 as applied to a truly private association because we found "no plan or purpose of exclusiveness" in Little Hunting Park. 396 U. S., at 236. But here, as there, membership "is open to every white person within the geographic area, there being no selective element other than race." *Ibid.* The only restrictions are the stated maximum number of memberships and, as in *Sullivan, id.,* at 234, the requirement of formal board or membership approval. The structure and practices of Wheaton-Haven thus are indistinguishable from those of Little Hunting Park.[9] We hold, as a consequence, that Wheaton-Haven is not a private club and that it is not necessary in this case to consider the issue of any implied limitation on the

---

[8] "The provisions of this subchapter shall not apply to a private club or other establishment not in fact open to the public, except to the extent that the facilities of such establishment are made available to the customers or patrons of an establishment within the scope of subsection (b) of this section." 42 U. S. C. § 2000a (e).

[9] Apparently one applicant was formally rejected during the preceding 12 years of Little Hunting Park's operation. App. 127 and Brief for Petitioner 7, *Sullivan* v. *Little Hunting Park,* 396 U. S. 229 (1969). At Wheaton-Haven one applicant was formally rejected in the preceding 11 years.

The Court of Appeals found it "inferable from Little Hunting Park's organization and membership provisions that it was built by the same real estate developers who built the four subdivisions from which members were drawn, as an aid to the sale of homes." 451 F. 2d, at 1215 n. 8. This inference may be erroneous. App. 24–36 and Tr. of Oral Arg. 24, 31–34, *Sullivan* v. *Little Hunting Park, supra.* In any event, *Sullivan* did not rest on any relationship between the club and real estate developers.

sweep of § 1982 when its application to a truly private club, within the meaning of § 2000a (e), is under consideration. Cf. *Moose Lodge No. 107* v. *Irvis,* 407 U. S. 163 (1972); *Daniel* v. *Paul,* 395 U. S. 298 (1969).

## II

Mrs. Rosner and the Tillmans, relying on 42 U. S. C. §§ 1981,[10] 1982, and 2000a *et seq.,* contend that Wheaton-Haven could not adopt a racially discriminatory policy toward guests. The District Court granted summary judgment for the respondents on these claims also, holding that Wheaton-Haven was a private club and exempt from all three statutes.

The operative language of both § 1981 and § 1982 is traceable to the Act of April 9, 1866, c. 31, § 1, 14 Stat. 27. *Hurd* v. *Hodge,* 334 U. S. 24, 30–31 n. 7 (1948).[11]

---

[10] "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

[11] The Act of Apr. 9, 1866, § 1, read in part:

"That all persons born in the United States . . . of every race and color . . . shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding." 14 Stat. 27.

The present codification of § 1981 is derived from Revised Statutes § 1977 (1874), which codified the Act of May 31, 1870, § 16, 16 Stat. 144. Although the 1866 Act rested only on the Thirteenth Amendment, *United States* v. *Harris,* 106 U. S. 629, 640 (1883);

In light of the historical interrelationship between § 1981 and § 1982, we see no reason to construe these sections differently when applied, on these facts, to the claim of Wheaton-Haven that it is a private club. Consequently, our discussion and rejection of Wheaton-Haven's claim that it is exempt from § 1982 disposes of the argument that Wheaton-Haven is exempt from § 1981. On remand the District Court will develop any necessary facts concerning the adoption of the guest policy and will evaluate the claims of the parties[12] free of the misconception that Wheaton-Haven is exempt from §§ 1981, 1982, and 2000a.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings.

*It is so ordered.*

---

*Civil Rights Cases,* 109 U. S. 3, 22 (1883); *United States* v. *Morris,* 125 F. 322, 323 (ED Ark. 1903), and, indeed, was enacted before the Fourteenth Amendment was formally proposed, *United States* v. *Price,* 383 U. S. 787, 804 (1966); *Hurd* v. *Hodge,* 334 U. S. 24, 32 n. 11 (1948); *Oyama* v. *California,* 332 U. S. 633, 640 (1948); *Civil Rights Cases, supra,* 109 U. S., at 22, the 1870 Act was passed pursuant to the Fourteenth, and changes in wording may have reflected the language of the Fourteenth Amendment. See *United States* v. *Wong Kim Ark,* 169 U. S. 649, 695–696 (1898). The 1866 Act was re-enacted in 1870, and the predecessor of the present § 1981 was to be "enforced according to the provisions" of the 1866 Act. Act of May 31, 1870, § 18, 16 Stat. 144.

[12] Respondent McIntyre urges that the judgment in his favor should be affirmed as to him because he was merely a director of Wheaton-Haven and was later defeated in his bid for re-election to its board, and because, in his deposition, he stated that he opposed the Association's exclusionary practices. Neither the District Court nor the Court of Appeals discussed Mr. McIntyre's individual liability, and we find it inappropriate to attempt resolution of this issue on the present record.