UNITED STATES of America, by John MITCHELL, Attorney General of the United States, Plaintiff,

v.

YOUNG MEN'S CHRISTIAN ASSOCIATION OF COLUMBIA, SOUTH CAROLINA, a corporation, Defendant.

Civ. A. No. 68-267.

United States District Court,
D. South Carolina,
Columbia Division.

Feb. 6, 1970.

Joseph O. Rogers, Jr., U. S. Atty., Columbia, S. C., and Barry H. Weinberg and Robert B. Hocutt, Attys., Dept. of Justice, Washington, D. C., for plaintiff.

D. W. Robinson, Robinson, McFadden & Moore, Columbia, S. C., for defendant.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND DECREE

DONALD RUSSELL, District Judge.

This is an action instituted by the Attorney General under authority of Section 2000a–6, 42 U.S.C., and Section 1345, 28 U.S.C., against the defendant Young Men's Christian Association of Columbia, South Carolina. Trial was had before me, at which testimony was admitted on behalf of both plaintiff and defendant. Thereafter, both parties filed exhaustive briefs, setting forth their respective positions. After hearing the testimony and upon consideration of the arguments of counsel, including their proposed Findings of Fact and Conclusions of Law, the Court makes the following Findings of Fact and Conclusions of Law herein:

FINDINGS OF FACT

(1) The defendant is a tax exempt, non-profit, eleemosynary corporation operated under the title Young Men's Christian Association of Columbia, South Carolina, and chartered under the laws of South Carolina.

(2) It is governed by a twenty-one member Board of Directors elected by the membership of the defendant Association at annual meetings held in May. Such directors elect a full-time General Secretary, who is responsible for the day-to-day operation by the Association of its administrative and physical facilities. It, also, operates through a number of committees, who are expected to report to the Board monthly. Among such committees is one on membership. The General Secretary is an *ex officio* member of all committees.

(3) The defendant is not connected with either the national or international

Y.M.C.A. organizations, though it has customarily made an annual voluntary contribution to the foreign work of the National Council of Young Men's Christian Associations of the United States and on occasions in the past has made some voluntary financial contributions to the work of the National Council itself. It does not participate in the local United Fund and derives its income solely from dues paid by its members and by income from certain investment funds available to it. In order to secure dues-paying members, it conducts annually in February, a membership drive in the Columbia area to secure renewals from old members and to solicit new members. It has at this time between five and six thousand members. So far as the record indicates, it has established no ceiling on its membership, though its physical facilities may provide a limit. It promotes its annual membership drive with donated radio, television and newspaper advertising and through the distribution of pamphlets outlining its services.

(4) All funds of the Association, whether received in the form of dues or by way of return on investments, are deposited in a single account and are disbursed on order of the Association's Treasurer.

(5) There are six different types of memberships in the Association:

(a) A Boy's membership, which costs $20.00 annually, and is available to boys between the ages of 8 and 16. In order to stimulate this program, the Association encourages adults to sponsor memberships in behalf of worthwhile boys who may not be able to afford the yearly fee: a Big Brother membership at $20.00 a year, and a Two Big Brother membership at $40.00 a year.

(b) A Senior membership, which costs $25.00 annually, and is available to men 17 years of age and older. This membership allows free use of all the Association's facilities except the Health Club, which the member may use as often as he likes providing he pays $2.00 on each occasion.

(c) A Business Men's membership, which costs $40.00, and is available on the same terms as the Senior membership, the only difference being the size of locker which the member receives.

(d) A Health Club membership which costs $100.00 annually, and differs from the Business Men's membership in allowing free use of the Health Club.

(e) A Gray-Y membership, which is a Boy's Club membership, and costs $250.00 annually. The members of the Club participate in seasonal sports activities at the Columbia schools which have requested the program. Twelve city schools currently participate in this program.

(f) A Dormitory membership, which costs $2.50 quarterly ($10.00 a year) and entitles the holder, upon payment of the dormitory rental, to sleep in the dormitory rooms and use all physical facilities on the same basis as a Senior member.

(6) The Association has no specific, detailed qualifications for membership in any of its programs other than as expressed in its Constitution that "Any young man of good moral character may become a member". Each applicant, however, is required to fill out an application form, which is available upon inquiry of the Desk Clerk stationed in the Association's lobby. The information required on the application form in all programs, other than that involving use of the dormitory facilities, includes the applicant's name, address, telephone number, and identification of his church affiliation. While theoretically such applications are to be approved by the Membership Committee of the Association's Board, in actual practice they are approved routinely by either the General Secretary or the Physical Department Director without any meeting of the Membership Committee and without any vote of either the Association's Board or its membership. The grounds on which an application is occasionally disapproved are, in the words of the General Secretary, when the applicant is known

to be an alcoholic, a thief, or a bad credit risk. The criterion for approval was stated to be the sincerity and willingness of the applicant to participate and join in the use of the Association's facilities, though it was not clear how the General Secretary could normally determine this from new members from the meager information available to him on the application form.

(7) The application for dormitory accommodations, though requiring the applicant to join the Association, included an agreement by the applicant to abide by the rules and regulations applicable to occupants of the dormitory facilities and requested two references. No letters of reference were required. The approval of the applications—certainly at times—was perfunctory and involved no interview of the applicant.

(8) The facilities of the Association are all located in a seven-story building located on Sumter Street in downtown Columbia, South Carolina. The building includes a dormitory, shower rooms, a swimming pool, a chapel, meeting rooms, exercise rooms, basketball courts, handball courts, squash courts and health club facilities. Attendance cards are maintained on members using these facilities and access thereto is controlled by the Desk Clerk in charge of the membership files.

(9) Informal sports teams, assembled by members without assistance from the staff of the Association itself, have been formed from the membership and such informal teams have occasionally competed with similar teams in Georgia and North Carolina and at the Association's facilities in Columbia. On a few rare occasions, too, public exhibitions by well known sports figures, almost exclusively from without South Carolina, have been held at the facility at which an admission fee was charged. The Columbia Churches basketball league regularly uses each year the basketball courts of the Association and, through financial arrangement with the University of South Carolina, the handball and squash courts of the Association are used by

the Physical Education Department of that institution at agreed times.

(10) The dormitory facilities of the Association consist of 100 rooms and 153 beds. It is the contention of the defendant that no rooms are rented for less than one week's occupancy. There was undisputed testimony, however, that on occasions, rooms had been rented to a number of transients for a single night's occupancy, though on one such occasion, a Negro, included in the group seeking occupancy, was alone denied occupancy, the Clerk on duty stating that it was against the policy of the Association to accept Negroes. The weekly rental was about $10.00 per week, plus a quarterly membership fee of $2.50. On these occasions when there was a single-night occupancy, a charge of $3.00 was made.

(11) All persons admitted for occupancy in the dormitory were required to apply for membership in the Association but no special investigation was apparently had. And, at least on those occasions when witnesses who testified to their occupancy applied for accommodations, there was no investigation of their qualifiactions or submission of their applications to anyone other than the Clerk who handled the same routinely. All residents within the dormitory accommodations have full and free use of all the Association's facilities and services.

(12) The records of the Association show a large number of occupants of dormitory rooms paid $3.00. The plaintiff contends this indicates that a substantial number of occupants of dormitory space at the Association's facilities did so for a single night's occupancy. In support of this, the plaintiff points to the charge made in the undisputed instance when certain persons were provided "one-night" occupancy and to the statement of the clerk on duty at the time that the standard charge for "one-night" occupancy was $3.00. The defendant offered evidence that such payments were made by occupants who actually remained at the dormitory for a week or more and were making partial

payments on their weekly charge. Under my construction of the law, it is not necessary to resolve this conflict in the contention of the parties. The record shows that the defendant did rent generally accommodations in its dormitory for a stay of no more than one week and the plaintiff contends that this is sufficient to qualify the Association as providing accommodations for "transient guests".

(13) The defendant contended that it did not have any policy to deny the use of its facilities on account of race. However, the record is clear that a number of Negroes had applied for membership in a number of the Association's programs, including the use of its dormitory facilities, and had been denied admission. The General Secretary of the Association at the time indicated that those denials with which he was familiar were based upon the conclusion that the applications were not made in good faith. However, I think it is clear from the record that the defendant did have a policy of denying its facilities to Negroes. If it did not have such policy, there would be no reason for it to contest this application of the Attorney General for an injunction. The only purpose of this action is to eliminate any discrimination by the defendant against Negroes. If the Association has no such policy of discrimination, and were willing so to state for the record, there would be no reason for the maintenance of this action. The Association's very objection to the action proves its policy and practice of discrimination.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this action under Section 2000a–6, 42 U.S.C.

2. The defendant, in the operation of its dormitory facilities, provides lodging for transient guests within the meaning of 42 U.S.C. sec. 2000a(b) (1). In reaching this conclusion, I have construed the term "transient" to include lodgers of a week or less. It is this construction that represents the crucial controversy between the parties. The defendant argues that the evidence of a single occasion on which "single-night" occupancy was allowed and on which it contends the clerk on duty had acted without authority cannot establish that it was the policy of the defendant to accept "single-night" occupancy. From this point, it proceeds to argue with considerable force and with rather persuasive evidence from the legislative history of Section 2000a, 42 U.S.C. that "transient", as used in connection with lodging under that section, is to be confined in its application to "over-night" occupancy and will not be extended to lodging by the week, which represented, it urges, its policy. On the other hand, the plaintiff has cited and relies confidently on two decisions from Courts of this Circuit, holding, after a review of the same legislative history, that "transient" guests embrances lodgers by the week. United States v. Beach Associates, Inc. (D.C.Md.1968) 286 F.Supp. 801, 808; United States v. Sadler (No. 570, E.D. N.C., January 15, 1968). I feel obliged to accept the construction of "transient" adopted in these decisions. Since the defendant concedes that it is its policy to rent rooms in its dormitory by the week, it follows that, under the construction adopted in the *Beach Associates Case,* the defendant does provide, as I have concluded, lodging for "transient" guests within the meaning of 42 U.S.C., section 2000a(b) (1). And, in its operation of its dormitory facilities and in offering lodging to "transient guests", as that term has heretofore been construed, the defendant does not operate as a private club within the meaning of Section 2000a(e).

3. Since a part of the facilities and operations of the defendant, conducted in the same establishment, is covered by the Civil Rights Act of 1964, as found in the previous Conclusion of Law, it follows that the entire operations of the defendant are brought within the coverage of Section 2000a, 42 U.S.C.

## DECREE

Pursuant to the foregoing Findings of Fact and Conclusions of Law, it is here-

by ordered that the defendant, its officers, agents and employees, are hereby permanently enjoined from denying any person the full and equal enjoyment of the goods, services, facilities, advantages and accommodations of any of the aforesaid establishment on the ground of race, color, religion or national origin.

Each party shall bear its own costs.

The Court retains jurisdiction for the purpose of issuing any additional orders as may be necessary or appropriate to modify or enforce this Decree.