Thomas WRIGHT, Jr., et al.

v.

The SALISBURY CLUB, LTD., et al.

Civ. A. No. 78-0706-R.

United States District Court,
E. D. Virginia,
Richmond Division.

Oct. 18, 1979.

Arthur F. Samuel, Robert A. Pustilnik, Samuel & Pustilnik, Richmond, Va., for plaintiffs.

James M. Minor, Jr., Donald W. Lemons, Parker, Pollard, Brown, Froman & Lemons, Inc., Richmond, Va., for defendants.

## MEMORANDUM

WARRINER, District Judge.

### I.

Plaintiffs, Dr. and Mrs. Thomas Wright, Jr., live in a residential subdivision in Chesterfield County, Virginia, known as "Salisbury." The corporate defendant, The Salisbury Club, Ltd., was organized and exists under the laws of Virginia as a country club to provide recreation exclusively for its members and guests. The Club is located in Salisbury subdivision and was originally organized by the subdivision developer to enhance the saleability of the subdivision lots.

Plaintiff Dr. Wright applied for membership in the country club in June 1977. The application was denied. Plaintiff later sub-

mitted another application; this application also was disapproved. It is beyond dispute that Dr. Wright was refused membership in the country club solely because he is a Negro.

Dr. Wright and his wife claim they have been deprived, on account of their race, of their rights to contract for membership with and purchase stock in the defendant corporation, in violation of 42 U.S.C. §§ 1981, 1982, and the Thirteenth Amendment of the United States Constitution. Plaintiffs seek injunctive relief and damages.

## II.

At the outset this Court emphasizes its finding that plaintiff Dr. Wright was denied membership in the Salisbury Club because of his race. The Court finds, further, that the Salisbury Club maintains a racially discriminatory membership selection process. The Club enforces an unwritten policy against non-Caucasian members.[1] Non-white applicants who may meet all other criteria will nevertheless be rejected on account of their race.[2]

The defendants answer plaintiffs' charge of racial discrimination by asserting that the Salisbury Club is a private club, organized exclusively for the recreational and sporting pleasures of its members, their families, and guests. The defendants argue

that in their capacity as a private club they have a constitutional right to select their fellow members by whatever criteria they wish, and to associate with whomever they choose. This right, say defendants, allows them to exclude Dr. Wright on account of his race.

■ The legal issues in this case arise and will be resolved under Section 1 of the Civil Rights Act of 1866, codified in 42 U.S.C. §§ 1981, 1982 as these sections may be affected by the constitutional right of privacy—the right to be let alone. The Court is hopeful that careful factual, statutory, and constitutional analysis will not obscure a broad perspective of what is at stake in this controversy. At the core of the case is a conflict between "two profound claims of right." *Cornelius v. Benevolent Protective Order of Elks*, 382 F.Supp. 1182, 1187 (D.Conn.1974) (Blumenfeld, J.). Plaintiffs' claim that they have a right to be free from racial discrimination is supported by an established and vigorous social and legal policy of nondiscrimination. Defendants' claim that they have a right to associate themselves in a private club, free from governmental intrusion, embodies respected and fundamental principles upon which this country was founded. The Court's task is to examine both claims with care, and to determine, under the facts presented, whether plaintiffs should be awarded relief in the assertion of their civil

---

1. In Salisbury's booklet on "Policies Governing the Use of the Club," it was once stated:

 From its inception, the Club was established for the exclusive use and enjoyment by members and guests of the Caucasian Race. Rules and customs in this regard long observed will continue. Reasonable variance in special appropriate instances by the proper Committee may be made to accomodate non-Caucasian guests.

 Although this language was later deleted from the booklet, at a Board of Directors meeting on 15 June 1971 it was decided that the policy against non-Caucasians should remain in force until changed by two-thirds vote of the full Club membership.

2. Defendants maintain that race exclusion is not necessarily the result of social choice but, instead, is dictated by financial necessity. They say the turmoil which would result from the acceptance of a black person's application

would cause sufficient loss of membership to imperil the club's ability to meet its financial obligations. Thus, they argue, if a black family were admitted the club would cease to exist and no one would benefit. While events might prove this argument sound, it is too facile to be admitted as a legal justification for unlawful race discrimination.

Further, when the board of directors sought to measure the temper of the membership by a questionnaire on admitting blacks, only 23.8% responded and of those who responded only 45.8% objected to black members. Thus, 12.9% of the membership responded negatively to the poll and 87.1% responded affirmatively or were so unconcerned with the issue that they did not respond. While there was at the time considerable turmoil in the press over the issue of Dr. Wright's application, the overwhelming majority of the membership of the club did not appear to be unduly agitated.

rights, or whether the Club members should prevail because of their constitutionally protected rights of privacy and association.[3]

## III.

### THE § 1981 CLAIM

42 U.S.C. § 1981 provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . .."[4] The Court having found that Dr. Wright was denied the opportunity to contract for membership in the Salisbury Club because of his race, it would seem that § 1981 affords Dr. Wright a remedy. The matter, however, is not so easily resolved.

In a series of cases decided within the last decade, the Supreme Court has made clear that 42 U.S.C. §§ 1981, 1982 reach "private" as well as officially sanctioned acts of discrimination. *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *Tillman v. Wheaton-Haven Recreation Ass'n*, 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973); *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); *Jones v. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). The same cases leave unanswered the question of whether §§ 1981, 1982 prohibit racial discrimination by "truly private" associations.[5] The Court did not avoid this question; it simply never had to consider it. None of the cases involved an organization or club that could be charac-

terized by the Court as truly private. As a consequence, it remains uncertain just what a truly private association is, and whether such an association lies beyond the reach of §§ 1981, 1982.

This Court will begin its analysis of plaintiffs' claim under § 1981 by examining the nature of the Salisbury Club. If the facts indicate that Salisbury is not truly private, it is likely that the plaintiffs must prevail.[6] If, on the other hand, the facts show that the Salisbury Club is truly private, a question exists about whether the Club's racially motivated denial of Dr. Wright's application is privileged.

### A. *The Salisbury Club, Ltd.*

 Whether a given club is truly private is a determination to be made in light of the facts of each case. The test for private club status, in controversies arising under §§ 1981, 1982, is whether, without regard to race, the club's membership policies and practices manifest "[a] plan or purpose of exclusiveness." This test was first adopted by the Supreme Court in *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 236, 90 S.Ct. 400, 404, 24 L.Ed.2d 386 (1969), and later cited with approval in *Tillman v. Wheaton-Haven Recreation Ass'n*, 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973). It is closely related to, and indeed may have derived from, a variety of tests employed by courts in resolving whether a club quali-

---

3. The tension between the interest in curbing discrimination and insulating certain areas of private choice from government regulation has been discussed thoughtfully in a number of articles. *See*, e. g., Comment, *Discrimination in Private Social Clubs: Freedom of Association and Right to Privacy*, 1970 Duke L.J. 1181; Note, *The Expanding Scope of Section 1981: Assault on Private Discrimination and a Cloud on Affirmative Action*, 90 Harv.L.Rev. 412, 433–40 (1976); Comment, *Private School Desegregation Under Section 1981*, 124 U.Pa.L. Rev. 714, 718–54 (1976); Note, *Section 1981 and Private Groups: The Right to Discriminate Versus Freedom from Discrimination*, 84 Yale L.J. 1441 (1975).

4. The full text of the statute states:
 All persons within the jurisdiction of the United States shall have the same right in

every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

5. The term "truly private" was coined by the Supreme Court in *Tillman v. Wheaton-Haven Recreation Ass'n*, 410 U.S. 431, 438–39, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973) to distinguish between "private" in the sense of non-governmental and "private" in the associational sense.

6. The contingency centers on the countervailing right of privacy.

fies for the "private establishment" exemption contained in Title II of the Civil Rights Act of 1964. 42 U.S.C. § 2000a(e).[7]

The association that was challenged in *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969), was a nonstock corporation organized to operate a community park and playground for residents of a specified area in Fairfax County, Virginia. 396 U.S. at 234, 90 S.Ct. 400. According to the bylaws of Little Hunting Park, a resident of the area owning a membership share was entitled to use the corporation's recreation facilities, and, upon selling or leasing his residence, to assign his share to the purchaser or tenant. The controversy in *Sullivan* arose when a Little Hunting Park shareholder leased his house and assigned his membership share. The board of directors disapproved the membership assignment because the assignee was black.

The homeowner and lessee in *Sullivan* joined as plaintiffs and sued Little Hunting Park under 42 U.S.C. § 1982. The Virginia trial court concluded that Little Hunting Park was a private social club and dismissed the complaint. The Virginia Supreme Court refused to hear an appeal. The United States Supreme Court granted certiorari. In reversing and ruling for plaintiffs, the Court noted that the record did not support a conclusion that Little Hunting Park was private. "There was no plan or purpose of exclusiveness. [Little Hunting Park was] open to every white person within the geographic area, there being no selective element other than race." 396 U.S. at 236, 90 S.Ct. at 404.

The Court confronted issues similar to those raised in *Sullivan* in *Tillman v. Wheaton-Haven Recreation Ass'n*, 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973). The Wheaton-Haven Recreation Association was a nonprofit corporation organized to operate a swimming pool. Membership in the corporation was keyed to the geographic area within a three-quarter mile radius of the pool; the corporate bylaws provided that one who purchased a home within that area was entitled to several "preferences" for membership. Suit was brought against the Association when it refused to extend those preferences to a new homeowner in the three-quarter mile area because the homeowner was black.

The district court in *Tillman* granted summary judgment for the Association, a decision affirmed by the Fourth Circuit. 451 F.2d 1211 (4th Cir. 1971). Both Courts concluded that Wheaton-Haven was a private club, and thus exempt from the sanctions of the Civil Rights Act. The Supreme Court reversed, and expressly rejected the finding that Wheaton-Haven was a private club. 410 U.S. at 438, 93 S.Ct. 1090. Like Little Hunting Park, the Wheaton-Haven Recreation Association opened its membership to all white persons living within a limited geographic area, but not to nonwhites. There was no selective element other than race, nor was there evidence establishing exclusivity. The Wheaton-Haven Recreation Association, thus, was not truly private.

In *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), the Supreme Court considered a § 1981 claim brought by black applicants who had been

---

7. This exemption provides that the provisions of the 1964 Act pertaining to public accommodations "shall not apply to a private club or other establishment not in fact open to the public . . . ." 42 U.S.C. § 2000a(e). Cases construing the exemption are collected and analyzed in Annot., 8 A.L.R.Fed. 634 (1971). *See also* Note, *Public Accommodation Laws and the Private Club*, 54 Geo.L.J. 915 (1966); Note, *The Private Club Exemption of the Civil Rights Act of 1964: A Study in Judicial Confusion*, 44 N.Y.U.L.Rev. 1112 (1969); Note, *Civil Rights Act of 1964—Public Accommodations—Private Club Exemption*, 45 N.C.L.Rev. 498 (1967).

When the Supreme Court established the exclusivity test in *Sullivan* it cited *Daniel v. Paul*, 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed.2d 318 (1969), a case arising under the Civil Rights Act of 1964. This Court believes that the exclusivity test is the functional equivalent of the multitude of tests utilized by courts in determining whether a particular club or establishment is "not in fact open to the public." The principal consideration, under any test, is whether the club in question is genuinely selective and exclusive.

denied admission by two all-white private schools. In its decision affirming judgment in favor of the applicants, the Court noted that neither of the schools were truly private:

> Both [schools] advertised in the 'Yellow Pages' of the telephone directory and both used mass mailings in attempting to attract students. . . . [The] 'schools are private only in the sense that they are managed by private persons and they are not direct recipients of public funds. Their actual and potential constituency, however, is more public than private. They appeal to the parents of all children in the area who can meet their academic and other admission requirements.' . ..

The pattern of exclusion is thus directly analogous to that at issue in *Sullivan v. Little Hunting Park, Inc.,* . . . and *Tillman v. Wheaton-Haven Recreation Ass'n,* . . . where the so-called private clubs were open to all objectively qualified whites—*i. e.,* those living within a specified geographic area.

427 U.S. at 172 n. 10, 96 S.Ct. at 2595 (citations omitted).

The Salisbury Club, Ltd. is a nonprofit corporation that was organized in 1963 to operate a country club for the exclusive use and recreation of its members and guests. It is a multi-function recreational club, having swimming, tennis, golf, dining, and related facilities. Although there is a natural limit on membership, there is no numerical limit under the bylaws.[8] To become a member at Salisbury one must file an application, receive the endorsement of two members, be recommended by the member-

ship committee, and thereafter be approved by seventy-five percent of the board of directors present at the meeting in which the vote is taken. Substantial initiation fees and membership dues are required.[9] The Club has never been the recipient of federal, State, or local funds.

■ An analysis of the membership policies and practices of the Salisbury Club demonstrates that it differs from Little Hunting Park and the Wheaton-Haven Recreation Association in several respects. First, unlike membership in Little Hunting Park and in the Wheaton-Haven Recreation Association, membership in the Salisbury Club is not organically tied to a limited geographic area. Little Hunting Park was organized expressly for the benefit of residents of a defined area of Fairfax County, Virginia. Similarly, the bylaws of the Wheaton-Haven Recreation Association provided that "[m]embership shall be open to bona fide residents . . . of the area within a three-quarter mile radius of the pool . . .," 410 U.S. 433 n. 3, 93 S.Ct. 1092; one residing within that area was entitled, by virtue of his residency, to a preference for membership at Wheaton-Haven. By contrast, the bylaws of the Salisbury Club accord no formal preference to the residents of the Salisbury subdivision, and one buying a home there obtains no membership rights.[10] The number of Club members residing outside of Salisbury is nearly equal to the number living within the subdivision. The subdivision is a focus of membership recruitment, but the Club has never represented that homeownership in Salisbury is a qualification for membership.

---

**8.** A letter sent to all members in September, 1977 noted that the total membership at Salisbury was approximately 560. The same letter stated that the projected maximum membership was 800–900.

**9.** The fees and dues vary depending upon membership classification. In 1977, the lowest classification required an initiation fee of $300.00 with annual dues of $264.00 ($22.00 per month), while the highest required $1,200.00 for initiation fee with annual dues of $732.00 ($61.00 per month). A special classification for members of the clergy required no initiation

fee, and entitled them to use all club facilities at the cost of $39.00 per month ($468.00 annually).

**10.** For a substantial period of time in the development of the Salisbury Club, Salisbury residents were informally preferred in comparison with applicants from other areas who were subjected to closer scrutiny. At the time Dr. Wright's application was denied, the Club had formally refused only one applicant from the Salisbury subdivision.

Secondly, the Salisbury Club requires all applicants to have the recommendation of two members.[11] The Wheaton-Haven Recreation Association required the recommendation of one member, and then only if the applicant lived beyond the geographic preference area. The necessity of two recommendations makes Salisbury marginally more exclusive than Wheaton-Haven. The number of persons who have been unable to garner the requisite recommendations, or who have been informally discouraged in their efforts to proceed with the application process is not shown by the evidence and cannot, by its nature, be discovered.

A third distinction between the Salisbury Club and Wheaton-Haven pertains to the final step in the admissions process. Wheaton-Haven required favorable action by a majority of the board of directors or of the membership. Salisbury requires an affirmative vote by seventy-five percent of the board of directors present when the vote is taken, and permits no vote by the membership. In practice at Salisbury the board of directors does not vote on each individual applicant but votes to approve, with or without exceptions, the list of names submitted by the chairman of the membership committee. The evidence indicates that applicants rarely are turned down by the board of directors. Nonetheless, the seventy-five percent requirement serves to emphasize the selectivity of the Salisbury Club.

There are further distinctions between the Salisbury Club and the Wheaton-Haven Recreation Association. It costs more to join Salisbury than Wheaton-Haven; thus it might be said that Salisbury is more financially exclusive. Moreover, because of the variety of recreational facilities found at Salisbury—swimming, golf, tennis, dining—it might also be said that Salisbury is more socially exclusive than Wheaton-Haven, which offered swimming alone. The Court acknowledges that these differences of financial and social exclusivity are differences in degree only. Alone the differences may be of no consequence; added to other considerations, they help define the hazy line between private and truly private clubs.

A final factor meriting attention is that the Salisbury Club has engaged in some solicitation of members. On at least one occasion the Club sent a leaflet describing Club facilities to residents of the Salisbury subdivision. On another occasion, in 1977, the Club utilized a membership list from the nearby Briarwood Club, which had closed, and after screening the list, invited some to apply. Furthermore, notices appearing in a monthly publication of the Salisbury Corporation, which manages the Salisbury subdivision but is legally unrelated to the Salisbury Club, often refer to activities at the Club.[12] Lastly, real estate advertisements placed by local realtors have referred to the Salisbury Club in emphasizing the desirability of Salisbury subdivision as a place to live.[13]

> Why not take advantage of a great opportunity. In conjunction with an October and November membership drive, Salisbury Country Club has reduced the initiation fee for golfing and non-golfing members. A golfing membership now costs only $600 and a non-golfer can join for only $350. . . .
>
> . . . . .
>
> Why not join us at the Salisbury Club?

11. "Selectivity has often been said to be the essence of a private club and selection by recommendation serves to draw a line of demarcation between admitting the general public and only the select few." *Solomon v. Miami Woman's Club*, 359 F.Supp. 41 (S.D.Fla.1973). Other courts have noted that the requirement of member recommendations may be a significant indication of exclusivity. *See, e. g., Wright v. Cork Club*, 315 F.Supp. 1143 (S.D.Tex.1970); *United States v. Jack Sabin's Private Club*, 265 F.Supp. 90 (E.D.La.1967).

12. The notices appearing in the publication, which is known as the "Village Crier," typically are reminders of various meetings to be held at the Club. On one occasion, however, a notice was addressed to "all" the residents of Salisbury; it read:

13. An advertisement by one realtor states that the Club is "just a brief walk or bike ride from your Salisbury home." Additionally, a "Property Buyers Guide" for Salisbury subdivision includes a letter of welcome from the President of the Salisbury Club.

■ This Court believes that extensive advertising and membership solicitation is inconsistent with the genuinely selective and exclusive nature of a truly private club.[14] The Court does not find, however, that the Salisbury Club has engaged in extensive advertising or membership solicitation. Unlike the private schools in *Runyon*, the Club does not advertise or list itself in the "Yellow Pages" of the telephone book. Nor has the Club engaged in mass mailing amounting to a public offer, as did the schools in *Runyon*. Significantly, the large majority of public notices making mention of the Salisbury Club were not placed by the Club, but by local realtors and developers. Never has the Club represented that it is open to all who apply and meet certain objective qualifications.

The Court concludes that the membership policies and practices of the Salisbury Club evince a purpose and plan of exclusiveness. The Club's primary objective is to provide diverse recreational facilities to persons who are socially compatible and share common interests in recreational and social pursuits. The Club is selective, and maintains membership requirements that verify its selectivity; these requirements include a written application, sponsorship by two members, screening by a membership committee, approval by seventy-five percent of the board of directors, and payment of an initiation fee and substantial annual dues. The Court finds, in sum, that the Salisbury Club is a truly private club.

### B. Statutory Limitations on § 1981.

Title II of the Civil Rights Act of 1964 prohibits discrimination in places of public accommodation. 42 U.S.C. § 2000a. Section 201 of Title II, however, provides that "a private club or other establishment not in fact open to the public" is exempt from the sanctions of the Act. 42 U.S.C. § 2000a(e).[15] Several courts and commentators have concluded that this private establishment exemption, explicitly written into the 1964 Act, supersedes and thus limits § 1981 insofar as the statutes conflict. *Tillman v. Wheaton-Haven Recreation Ass'n*, 451 F.2d 1211 (4th Cir. 1971), *rev'd on other grounds*, 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973); *Cornelius v. Benevolent Protection Order of Elks*, 382 F.Supp. 1182 (D.Conn.1974) (Blumenfeld, J.); Note, *Private Clubs Expressly Excepted from the Coverage of the Civil Rights Act of 1964 Constitute an Exemption from the Civil Rights Act of 1866*, 6 Ga.L.Rev. 813 (1972).[16] The question has been reserved by the Supreme Court, which has never been confronted with a case in which a private club, arguably exempt from the coverage of the 1964 Act, has been challenged under § 1981.[17]

---

14. On this point there is general agreement. Cf. *Daniel v. Paul*, 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed.2d 318 (1969) (advertising by radio, newspaper, and magazine indicated that owners of an allegedly private recreational club were seeking a broad based patronage). *See also Nesmith v. YMCA*, 397 F.2d 96 (4th Cir. 1968); *United States v. Young Men's Christian Association of Columbia, S. C.*, 310 F.Supp. 79 (D.S.C.1970); *Bradshaw v. Wigam*, 11 Race Rel.L.Rep. 834 (S.D.Fla.1966).

15. 42 U.S.C. § 2000a. *Right to full and equal enjoyment of places of public accommodation.* (a) *Equal access.* All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin. (e) *Private establishments.* The provisions of this title shall not apply to a private club or other establishment not in fact open to the public, except to the extent that the facilities of such establishment are made available to the customers or patrons of an establishment within the scope of subsection (b) [Subsection (b) defines places of public accommodation.]

16. *See also Perkins v. New Orleans Athletic Club*, 429 F.Supp. 661 (E.D.La.1976); *Solomon v. Miami Woman's Club*, 359 F.Supp. 41 (S.D. Fla.1973); *Sims v. Order of United Commercial Travelers of America*, 343 F.Supp. 112 (D.Mass. 1972).

17. Cf. *Tillman v. Wheaton-Haven Recreation Ass'n*, 410 U.S. 431, 438–39, 93 S.Ct. 1090, 1094, 35 L.Ed.2d 403 (1973) ("[I]t is not necessary in this case to consider the issue of any implied limitation on the sweep of § 1982 when its application to a truly private club, within the meaning of § 2000a(e), is under consideration.") *See also Runyon v. McCrary*, 427 U.S. 160, 172 n. 10, 96 S.Ct. 2586, 49 L.Ed.2d 415

■ Salisbury, a truly private club evincing a plan and purpose of exclusiveness, is also an establishment "not in fact open to the public," and thus beyond the scope of the 1964 Act. This conclusion is supported not only by the earlier analysis of the membership practices and policies of the Salisbury Club, but also by the legislative history of the 1964 Civil Rights Act. When the private club exemption was debated in the Senate, Senator Humphrey, for the express purpose of "mak[ing] some legislative history," named a country club of which he was a member, the Army and Navy Club, as exempt. He described it as having "a fine golf club, recreational facilities, swimming pools, dining rooms, recreational halls." 110 Cong.Rec. 6007–08 (1964). In addition Senator Humphrey mentioned the Cosmos Club, the University Club, the Union League Club, and the Minneapolis Athletic Club as being "private membership clubs." *Id.* Senator Magnuson remarked that '[l]ocal fraternal organizations, private *country clubs*, and the like are outside the reach of Title II by reason of the bona fide private club exclusion." 110 Cong.Rec. 6007–08 (1964) (emphasis supplied).

The reasons that the private establishment exemption of the 1964 Civil Rights Act must be read by implication into § 1981 were well-stated by Judge Blumenfeld in *Cornelius v. Benevolent Protective Order of Elks*, 382 F.Supp. 1182, 1201 (D.Conn.1974):

First, '[c]ourts may properly take into account . . . [a] later Act when asked to extend the reach of . . . [an] earlier Act's vague language to the limits which, read literally, the words might permit. . . .'

Second, '[t]he provisions of one statute which specifically focus on a particular problem will always, in the absence or express contrary legislative intent, be held to prevail over provisions of a different statute more general in its coverage. . . .'

Third, the legislative history of the 1964 Act supports a harmonization of the statutes. When Congress passed the 1964 Act, it believed it was enacting the first federal legislation prohibiting private discrimination in public accommodations. . . . Thus, the absence of express language in the 1964 Act limiting the 1866 Act is hardly evidence of an intention not to have that effect.

(citations omitted).

■ The third reason advanced by Judge Blumenfeld merits additional explanation. The recognized rule of statutory construction is that repeal by implication is not favored. *United States v. Borden Co.*, 308 U.S. 188, 198–99, 60 S.Ct. 182, 84 L.Ed. 181 (1939). To support such a repeal, courts require that the two provisions be in irreconcilable conflict, and that the intent of the legislature be for repeal. *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 154–55, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976).

If applied literally, § 1981 would reach within private establishments protected by the 1964 Act; the two statutes, thus, are in conflict. But the legislative history of the Civil Rights Act of 1964 does not indicate that Congress intended to limit or repeal part of the Civil Rights Act of 1866. In another case the absence of an express congressional intention to limit an earlier enactment might prove decisive; not so, however, in this instance. When Congress enacted the 1964 legislation, it did not and could not have known about the conflict with the 1866 Act. Indeed, not until 1968, four years after the 1964 Act became law, did the Supreme Court first determine that the Civil Rights Act of 1866 prohibited "private" as well as officially sanctioned discrimination. *Jones v. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). Thus the conflict between the two statutes was latent when Congress drafted the 1964 legislation, and the absence of express language in the 1964 Act limiting the 1866 Act is inconsequential.

(1976). Writing for the majority in *Runyon*, Justice Stewart stated emphatically that the case "[did] not present any question of the right of a private social organization to limit its membership on racial or any other grounds." 427 U.S. at 167, 96 S.Ct. at 2593.

■ The Court rules that the private club exemption contained in Title II of the Civil Rights Act of 1964 operates as a limitation on the Civil Rights Act of 1866. Accordingly, having found previously that Salisbury is a truly private club as well as an establishment "not in fact open to the public," the Court finds further that the membership policies and practices of Salisbury are beyond the statutory reach of § 1981.

## IV.

### THE § 1982 CLAIM

■ Because §§ 1981, 1982 have a common lineage, there is reason to believe that any limitation that operates on § 1981 also operates on § 1982. Thus, the finding that Salisbury is a truly private club exempt from § 1981 might dispose of plaintiffs' claim under § 1982 as well. At least one commentator has argued that if a club is truly private, there cannot be the connection between club membership and property that is necessary to implicate § 1982.[18] While the Court finds these arguments convincing, it nonetheless will examine plaintiffs' § 1982 claim separately. Analysis of the § 1982 claim will entail some reconsideration of cases previously discussed.

Plaintiffs' complaint states that they have been deprived of their right to purchase stock in the defendant corporation because of their race, in violation of 42 U.S.C. § 1982. Later pleadings reveal that the plaintiffs had the opportunity to buy stock issued by The Salisbury Club, Ltd., but that they chose not to buy after learning that ownership of stock did not confer club membership. Stipulations entered between the parties confirm that shareholder status is distinguished from membership status, and that there are in fact no restrictions on the transfer of stock other than payment of a transfer fee. Accordingly, the Court will not consider the alleged denial of the right to purchase stock as the gravamen of plaintiffs' § 1982 claim.

There remains the question of a tie between lot ownership in Salisbury subdivision and membership in the Club. Section 1982 provides that "[a]ll citizens . . . shall have the same right . . . to . . purchase . . . real and personal property."[19] To establish a claim under § 1982, plaintiffs must first show that membership in The Salisbury Club, Ltd., constitutes some type of "property." Ordinarily membership in a private club or association would not seem to implicate property rights. Yet the Supreme Court has made clear that club membership can be so closely associated to the sale or lease of property as to become "part" of that property. *Tillman v. Wheaton-Haven Recreation Ass'n*, 410 U.S. 431, 437, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973); *Sullivan v. Little Hunting Park*, 396 U.S. 229, 236–37, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969). Thus it is necessary to review this case in the context of § 1982.

In *Jones v. Mayer Co.*, 392 U.S. 409, 413, 88 S.Ct. 2186, 2189, 20 L.Ed.2d 1189 (1968), the Supreme Court held that § 1982 "bars *all* racial discrimination, private as well as public, in the sale or rental of property . . . ." (emphasis in the original). The *Jones* decision is significant for its broad, indeed its novel construction of § 1982. Earlier cases had indicated that § 1982 was limited to discriminatory property transactions sanctioned by the State. *Hurd v.*

---

**18.** See Note, *Private Clubs Expressly Excepted from the Coverage of the Civil Rights Act of 1964 Constitute an Exemption from the Civil Rights Act of 1866*, 6 Ga.L.Rev. 813, 821 (1972):

> [I]f a membership in the club is section 1982 property truly incident to the sale of a house in a subdivision, . . . then the club cannot be truly private . . ., and if it denies membership to a person on the basis of his race, both section 1982 and the 1964 Act are violated. Conversely, if it is determined that a club is truly private and not subject to the 1964 Act because there are criteria for selec-

tion of members other than race, then the club membership could not possibly be incident to a public sale of property. In this case, neither the 1964 nor the 1866 Act would be violated.

**19.** The full text of the statute states:

> All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

*Hodge,* 334 U.S. 24, 31, 68 S.Ct. 847, 92 L.Ed. 1187 (1948); *Corrigan v. Buckley,* 271 U.S. 323, 339, 46 S.Ct. 521, 70 L.Ed. 969 (1926). The Court in *Jones,* however, asserted that § 1982 also reaches racial discrimination in *private* transactions involving real and personal property.

Questions about the implications of the *Jones* decision were both answered and stimulated a year later in *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969). Little Hunting Park, as noted previously, was a nonstock corporation managing a community park and playground. According to its bylaws, one owning a membership share was entitled to use the corporation's recreational facilities and, upon leasing his house, to assign his share to his tenant. Plaintiff in *Sullivan* leased his home to co-plaintiff, and, in accordance with the bylaws, assigned his membership share; the board of directors refused to approve the assignment because the lessee was black.

Reviewing the case on certiorari to the Virginia Supreme Court, the United States Supreme Court held that § 1982 prohibited Little Hunting Park from withholding, on the basis of race, approval of the assignment of the membership share transferred incident to the lease of real property. 396 U.S. at 236–37, 90 S.Ct. 400. The bylaws of Little Hunting Park entitled shareholders to transfer their rights and privileges to use the corporation's recreational facilities; those rights, thus, were an integral part of the lease. In the opinion of the Court, "there [was] never . . . any doubt but that [the lessee] paid part of his $129.00 monthly rental for the assignment of the membership share in Little Hunting Park." 396 U.S. at 236–237, 90 S.Ct. at 404.

In *Sullivan* the Supreme Court reaffirmed the notion, first advanced in *Jones,* that § 1982 reaches private acts of racial discrimination. But the aim of the Court's analysis in *Sullivan* differed from that of the Court in *Jones.* The principal question in *Jones* was whether § 1982 could reach private acts of discrimination in property transactions. The issue in *Sullivan* was whether a membership share in Little Hunting Park was part of the interest conveyed as a leasehold, thus invoking the protections of § 1982. The Court found that it was.

The Court again considered the nature of § 1982 "property" in *Tillman v. Wheaton-Haven Recreation Ass'n,* 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973). The Wheaton-Haven Recreation Association was a nonprofit corporation organized for the purpose of operating a swimming pool. Membership in the Association was keyed to the geographical area within a three-quarter-mile radius of the pool. Under the bylaws of the Association, a person living within three-quarters of a mile of the pool received three preferences:

. . . he is allowed to apply for membership without seeking a recommendation from a current member; he receives preference over others, except those with first options, when applying for a membership . vacancy; and, if he is a [home]owner-member, he is able to pass to his successor-in-title a first option to acquire the membership Wheaton-Haven purchases from him.

410 U.S. at 436, 93 S.Ct. at 1093.

One of the petitioners in *Tillman* purchased a home within the geographic preference area surrounding the Wheaton-Haven pool. When he inquired about membership in Wheaton-Haven, he was discouraged from applying because he was black. Petitioner, in short, did not receive the membership preferences given white residents of the area; indeed, petitioner was never even given an application form.

When suit was brought against the Association, petitioners' claim under § 1982 was rejected by the district court, and thereafter by the Fourth Circuit Court of Appeals. 451 F.2d 1211 (4th Cir. 1971), *rev'd,* 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973). The Fourth Circuit felt that the Supreme Court's decision in *Sullivan* was distinguishable. In *Sullivan,* the bylaws of Little Hunting Park provided that membership *rights* in the corporation's recreational facilities could be assigned with the sale or lease

of property. In *Tillman*, however, the by-laws of Wheaton-Haven Recreation Association allowed only for the transfer of a *preference* for membership; although the preference might mature into membership, the possibility was so "speculative and remote" that, in the Fourth Circuit's view, it could not support a conclusion that there was a transfer of membership incident to the purchase of property. 451 F.2d at 1217.

The Supreme Court did not agree with the Fourth Circuit. In a unanimous decision, the Court explained that the membership preferences granted by the Wheaton-Haven Recreation Association to purchasers of property within the geographical preference area constituted part of the "property" purchased. "When an organization links membership benefits to residency in a narrow geographical area, that decision infuses those benefits into the bundle of rights for which an individual pays when buying or leasing within the area." 410 U.S. at 437, 93 S.Ct. at 1094. The Court held, therefore, that Wheaton-Haven's refusal to extend a membership preference to a black property owner violated the nondiscrimination requirement of § 1982.

Read together, *Sullivan* and *Tillman* provide guidance for resolving the question of when membership in a private club may constitute "property," and thus fall within the sweep of § 1982. The clubs in both cases shared certain features. Little Hunting Park was organized and incorporated for the purpose of providing recreational facilities for persons living within a limited geographic area; the same is true of the Wheaton-Haven Recreation Association. Furthermore, both organizations had by-laws which conferred on members or property owners residing within the preference area certain rights. In *Sullivan*, the bylaws of Little Hunting Park stipulated that members could assign their rights to use the corporation's park and playground to their tenants. In *Tillman*, the bylaws of Wheaton-Haven provided that one purchasing property within the preference area was entitled to a preference for membership in the Association.

The Salisbury Club, Ltd., like Little Hunting Park and the Wheaton-Haven Recreation Association, is a nonprofit corporation organized for the pleasure of its members and their guests. The Salisbury Club, however, was not organized exclusively for the residents of Salisbury subdivision; indeed, the bylaws of the Club accord no formal preference for residents of Salisbury. It is a fact, however, that the Club was organized as an attraction in the subdivider's efforts to sell lots in the subdivision. The value of residences in the area undoubtedly include a not insubstantial factor representing the proximity of the Club. Approximately fifty percent of the Club's members reside in Salisbury, and the subdivision is targeted for membership recruitment. Nevertheless a large percentage of members reside outside of Salisbury. While the Club was organized to enhance the value of the subdivision it was not serving residents of a limited geographical area.

Secondly, members of the Salisbury Club are not entitled to transfer, incident to the sale or lease of their home, either membership rights or preferences; neither do new property owners in the Salisbury subdivision obtain rights or preferences for Club membership. These distinctions are most significant for a link between property and club membership is the key if § 1982 is to be implicated. Members of Little Hunting Park were *entitled* to transfer membership rights to their tenants. In *Tillman*, persons purchasing real property within three-quarters of a mile of Wheaton-Haven pool were *entitled* to a preference for membership. No such claim is or can be made in this case.

 Plaintiffs have shown, as noted, that property values in the Salisbury subdivision are inflated due to the presence of The Salisbury Club, Ltd. Plaintiffs argue, in essence, that they paid more for their home because of its proximity to the Club. Advertisements placed by real estate firms have referred to the Salisbury Club in emphasizing the attractiveness of Salisbury subdivision as a place to live. Moreover, affidavits of real estate developers and agents support the claim that the value of

real property in Salisbury has been enhanced by the Club. But accepting that the price of homes in Salisbury reflects proximity to the Club, this Court is unable to assign legal significance to that fact. A price that represents nearness to a club is qualitatively different from a price paid in part for club membership or preference.

Plaintiffs also offer evidence supporting their allegation that the defendant encouraged new homeowners in the Salisbury subdivision to visit the Club and to apply for Club membership. For example, members of the Club cooperated in the "Salisbury Hospitality Program," which was established to welcome new residents of the Salisbury subdivision, to acquaint them with the Club, and to provide them with information about the community and surrounding area. References to the Club frequently may be found in the *Village Crier*, a monthly publication that is distributed to homeowners in the Salisbury subdivision by the Salisbury Corporation, an entity legally unrelated to the Salisbury Club.

Evidence of this nature cannot afford the property link between ownership of real estate in Salisbury subdivision and membership in the Salisbury Club. An invitation to examine a club's facilities, while significant, is distinguished from the right of membership and the preference for membership guaranteed to homeowners in *Sullivan* and *Tillman*. The Salisbury Club has never represented that one purchasing a home in Salisbury subdivision is entitled to membership, or a preference of membership, in the Club. The large majority of applicants from Salisbury subdivision have been accepted. In the final analysis, however, the Club retains power to accept or reject an application.

The sanctions of § 1982 do not operate unless there has been racial discrimination in a transaction involving property. Plaintiffs here have been unable to show that one who has bought a home in Salisbury subdivision, and has been refused admission to the Salisbury Club, has been denied "property" within the meaning of § 1982. Accordingly, irrespective of the status of the Salisbury Club as a truly private club, plaintiffs' § 1982 claim affords them no relief.

## V.

Although the Supreme Court never expressly has held that the Constitution protects from government interference the membership policies and practices of truly private social organizations, the Court on several occasions has recognized that all persons have a right to choose associates and to form clubs on the basis of personal prejudice.[20] *Evans v. Newton*, 382 U.S. 296, 298, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); *Bell v. Maryland*, 378 U.S. 226, 313, 84 S.Ct. 1814, 12 L.Ed.2d 822 (1964) (concurring opinion of Goldberg, J.). Perhaps the strongest statement of this right was written by Mr. Justice Douglas, dissenting in *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 179–80, 92 S.Ct. 1965, 1974–75, 32 L.Ed.2d 627 (1972):

> The associational rights which our system honors permits all white, all black, all brown, and all yellow clubs to be formed. They also permit all Catholic, all Jewish, or all agnostic clubs to be established. Government may not tell a man or woman who his or her associates must be. The individual can be as selective as he desires . . . [T]hat the Moose Lodge allows only Caucasians to join or come as guests is constitutionally irrelevant, as is the decision of the Black Mus-

---

**20.** This Court believes that the rights to choose members and to form a club necessarily comprehend the right to exclude. In a widely heralded article written in 1959 Herbert Wechsler suggested that the right to exclude and the right to be included are of equal constitutional magnitude. *See* Wechsler, *Towards Neutral Principles in Constitutional Law*, 73 Harv.L. Rev. 1, 34 (1959).

For commentary on the right of association, *see* Douglas, *The Right of Association*, 63 Colum.L.Rev. 1361 (1963); Emerson, *Freedom of Association and Freedom of Expression*, 74 Yale L.J. 1 (1964); Rice, *The Constitutional Right of Association*, 16 Hastings L.J. 491 (1965); Note, *Freedom of Association: Constitutional Right or Judicial Technique?*, 46 Va.L. Rev. 730 (1960).

lims to admit to their services only members of their race.

(quoted with approval by the majority in *Gilmore v. City of Montgomery*, 417 U.S. 556, 575, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974).

Other Supreme Court decisions establish that the Constitution harbors a zone of privacy into which the government may not intrude: *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (right to an abortion); *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (right of unmarried couples to obtain contraceptives); *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) (right to possess obscene matter within the home); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (right of married couples to use contraceptives). While *Griswold* and subsequent cases carefully delimit the privacy right to specific areas and conduct, this Court believes with Mr. Justice Douglas that a private social club constitutes a setting that is beyond the reach of the government.[21] The government has no business telling anyone who he must invite into his home; nor has the government the right to tell Salisbury, a private country club, who it must admit to membership.

Mr. Justice Brandeis asserted that the makers of our Constitution "conferred, as against the Government, the right to be let alone—the most comprehensive of rights

and the right most valued by civilized men." *Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (dissenting opinion).[22] This Court shares the opinion of Justice Brandeis, and finds that the Constitution affirmatively protects the right of persons to associate, free from government interference, in private social organizations. While this right is nowhere enumerated in the text of the Constitution, it is soundly premised on and is an essential aspect of the right of privacy.[23] Insofar as §§ 1981, 1982 would disturb the membership policies and practices of private social organizations, those statutes contravene constitutionally protected rights.

The Court adds a word of caution. In finding that the Constitution protects from government interference the membership policies and practices of private social organizations, this Court neither endorses nor approves of racially discriminatory membership policies. The Constitution "places no value on [racial] discrimination." *Norwood v. Harrison*, 413 U.S. 455, 469, 93 S.Ct. 2804, 2813, 37 L.Ed.2d 723 (1973). In today's world the moral right of a person to be judged on his merits and not on his race is self-evident.[24] That said, however, the Court believes that the federal government, under the aegis of the Constitution, is without the power and—had it the power—the ability to require that free citizens engage in social intercourse at the sufferance of a governmental arbiter.

**21.** In *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), the Court observed that "the application of § 1981 to the conduct at issue . . .—a private school's adherence to a racially discriminatory admissions policy—[did] not represent governmental intrusion into the privacy of the home *or a similarly intimate setting* . . . ." *Id.* at 178, 96 S.Ct. at 2598 (emphasis supplied). In a footnote to that statement the Court referred back to a discussion of "private clubs" as defined by the Civil Rights Act of 1964, 42 U.S.C. § 2000a(e). One of the implications of the footnote, in this Court's view, is that a private club has expectations and rights of privacy that resemble the home.

**22.** *See also* Clark, *Religion, Morality and Abortion: A Constitutional Appraisal*, 2 Loy.U.L. Rev. 1, 8 (1969) ("This [right to be let alone] is

one of the most fundamental concepts that the Founding Fathers had in mind when they drafted the Constitution."); Dykstra, *The Right Most Valued by Civilized Man*, 6 Utah L.Rev. 305 (1959); Griswold, *The Right to be Let Alone*, 55 Nw.U.L.Rev. 216, 217 (1960) ('The right to be let alone' is the underlying theme of the Bill of Rights.")

**23.** With Mr. Justice Goldberg, this Court believes that the right of privacy is grounded most logically on the Ninth Amendment. *See Griswold v. Connecticut*, 381 U.S. 479, 486, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (concurring opinion of Goldberg, J.).

**24.** At least, it had been self-evident until the recent success of racial discrimination under the rubric of "affirmative action."

No government ever has brought, or ever can bring, its people into social intercourse against their wishes. Whether one person will permit or maintain social relations with another is a matter with which government has no concern. . . If one citizen chooses not to hold social intercourse with another, he is not and cannot be made amenable to the law for his conduct in that regard; for even upon grounds of race, no legal right of a citizen is violated by the refusal of others to maintain merely social relations with him.

The *Civil Rights Cases*, 109 U.S. 3, 59, 3 S.Ct. 18, 55, 27 L.Ed. 835 (1883) (Harlan, J., dissenting).

### VI.

The Court summarizes its findings. The Salisbury Club, Ltd. is truly private social club. Salisbury also is a private establishment as defined by Title II of the Civil Rights Act of 1964; as such its membership policies and practices are exempt, by statutory implication, from § 1981. Next, irrespective of the status of Salisbury as a truly private club, plaintiffs' § 1982 claim is without merit; plaintiffs are unable to show that membership in the Salisbury Club is "property" within the meaning of § 1982. Finally, private club members have rights under the Ninth Amendment to the United States Constitution that protect them from governmental intrusion with respect to their membership policies.

For the reasons stated, plaintiff's motion for summary judgment is denied. Defendants' motion for summary judgment is granted.